[Crim. No. 2445. Third Dist. Nov. 27, 1953.]

THE PEOPLE, Respondent, v. HERMAN FREUDENBERG, JR., Appellant.

Dunnell, Herbert & Dunnell, O'Hara, O'Hara & Healy and O'Hara, Randall, Castagnetto & Kilpatrick for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

SCHOTTKY, J.—On November 6, 1952, the grand jury of Solano County returned an indictment against the defendant, Herman Freudenberg, Jr., charging him with the offense of manslaughter in that on the 18th day of October, 1952, he ".did wilfully, unlawfully, feloniously and without malice, kill one Elizabeth Anne Freudenberg, a human being." Upon being arraigned defendant made a motion to set aside the indictment for. lack of reasonable or probable cause, pursuant to section 995(2) of the Penal Code. The motion was denied and defendant entered a plea of not guilty. Trial was had before a jury and the jury returned a verdict finding defend-

ant guilty of manslaughter as charged in the indictment. The court then referred the case to the probation officer for investigation and report and, after a hearing on the report, denied defendant's motion for probation, and pronounced judgment. Defendant thereupon filed this appeal from said judgment.

Appellant urges a number of grounds for reversal of the judgment, but before discussing them we shall give a summary of the evidence.

Appellant, Herman Freudenberg, Jr., was a Buick dealer in the city of Fairfield in Solano County where he resided with his wife, Betty Freudenberg, her two children by a former marriage, and their daughter, Madeline, aged 2½ years. On Saturday, October 18, 1952, defendant went to work as usual about 8 a. m. and returned to his home about 1 p. m., after his place of business closed. Defendant spent the afternoon doing yard work at his home and receiving callers, and his wife spent most of the afternoon with him in the yard, tending the couple's young daughter. During the afternoon a Mr. and Mrs. Bushing, friends of the Freudenbergs, stopped at the Freudenberg home and the two couples sat around talking, and divided the contents of two cans of beer. Defendant and his wife had a dinner engagement with a Mr. and Mrs. Crane and a Mrs. Shirley Walt, and later in the afternoon they had a drink of bourbon and water while they were dressing to go out for dinner. At about 7:30 p. m. Mr. and Mrs. Crane and Mrs. Walt arrived at the Freudenberg home, and two rounds of drinks were served. About 8 p. m. the group left the Freudenberg home to go to dinner at a restaurant known as Dick's which was about a mile from the Freudenberg home in Fairfield. Upon entering the Crane automobile Betty Freudenberg remarked to defendant that the garage door was open and requested defendant to close it. Defendant replied that there wasn't anything of value in there to be stolen and that it was not necessary to close it, but his wife again told him to close it and he then closed the garage door. Defendant evidently did not like the tone of his wife's voice and when he returned to the car Mrs. Walt told Mrs. Freudenberg, "Betty, I think you got a dirty look." Nothing more was said at the time and the group drove to the restaurant. The Crane car was parked a short distance from the restaurant, and while the Cranes and Mrs. Walt entered the restaurant the Freudenbergs stood outside arguing. Betty said to defendant, "What's wrong with you Herman, anyway?" and defendant replied, "Well, I didn't like

the tone of your voice when you told me to close the garage door." Betty then stated, "Well, why don't you pack your bags and leave?" Betty then started to walk away from the restaurant but defendant and Mrs. Walt prevailed upon her to return to the party. Before entering the restaurant Betty apparently made some remark to defendant which made him angry, and he started walking toward home. Betty entered the restaurant and asked Mrs. Crane for the car keys so that she could go and pick up the defendant, but Mrs. Crane said that Mr. Crane would drive her, and Mr. Crane and Betty drove up the road about one-quarter of a mile to where defendant was walking, and Betty asked him to come back to the party. Defendant refused, telling her to do what she wanted. Betty then stated to Mr. Crane, "I had better get out and walk with him because if I don't he will never forgive me." Mr. Crane stopped the car and Betty walked a short distance opposite defendant and stated that she was sorry about the garage door. She said: "If it will do any good I will get down on my knees and tell you I am sorry." She proceeded to get down on her knees, but defendant picked her up almost immediately and stated that he was too embarrassed to go back to the party and that he was going home. Mr. Crane then turned his car around and left them. This was between 8:30 and 8:45 p. m., and the Freudenbergs were then about three blocks from their home.

Defendant and Betty walked home by different routes, she arriving first. She entered the house and saw her daughter Phyllis who was watching television in the living room. Defendant did not enter the house when he arrived but got into his automobile which was parked in front of the house and sat in the automobile for a short time until Betty came out of the house. She did not see him in the automobile, but he called to her and asked her where she was going and she said she was going out to look for him. They then entered the house together, and it was then between 9 and 9:30 p. m., and defendant went to their bedroom and began to undress, when Betty entered the bedroom and they apparently resumed their quarrel, and Betty stated to defendant, "Well, why don't you pack your bags and leave?" to which defendant replied, "O.K., I will." Defendant then put on his shirt, tie and coat and went to the kitchen to mix himself a drink, and found his wife already there having a drink. Defendant testified that they then discussed how silly it was to quarrel over such

trivial matters, reviewed their happy married life together, conversed about matters in general, and embraced and kissed each other several times. During this time, according to defendant, he and Betty had "two or three or maybe four drinks" of bourbon and plain water. After the couple had talked for some time, at about 11 p. m., Betty stated to defendant, "Herman, sometimes you make me so mad I could kill you." The record shows the following testimony by defendant:

"Q. [MR. LYNCH] Now, this statement she made about 'Herman, sometimes you make me so mad I could kill you,' did this all come out of the clear sky, there was nothing leading up to it? A. There was nothing leading up to it. No, it was a joking remark.

. . . . . . . . . . . .

"THE COURT: When you say it was a joking remark, what do you mean? A. It was just something someone would say in a joking remark."

Defendant replied to the effect that "Well, I could make it easy for you" or "I can help that." He then went to their bedroom, opened the bureau drawer and took out his .45 caliber Army type semiautomatic pistol which he had retained from his military service. The gun was not loaded, so defendant took out a loaded clip which was also in the drawer, put it in the gun, placed a shell in the chamber, which cocked the gun, while he was on his way back to the kitchen. Upon entering the kitchen defendant found his wife sitting on a chair-type metal stool, and, according to his testimony, he went up to her and said, "Here is the gun." In defendant's testimony at the trial is the following:

"Question [MR. LYNCH] : And do I understand you handed it to her muzzle first? Answer: It wasn't pointed to her. I[t] was off on an angle. She was facing this way and it was off at an angle.

"Question: And then what happened? Answer: Well, I told her there was a safety catch there on the grip handle, one that has to be depressed there. I showed her that, and I think I held the gun—I don't remember—it seems to me she took the gun with her left hand, and about that time it went off. It seems like I had just started to sit down on the stool or had already sat myself on the stool.

"Question: Did she have only her left hand on the gun? Answer: It seems to me—I don't know—it seems to me that she had her left hand on the gun and was reaching her other

hand for it. It seems to me both my hands were off the gun, but I don't know. It just happened so fast I just don't know.

"Question: You did have it, however, in your closed hand at the time you reached out to her? Answer: Yes sir.

"Question: She was seated at the time, was she? Answer: Yes sir.

"Question: What was your position? Answer: I was either standing or just stooping down to be seated in the chair.

. . . . . . . . . . . .

"Question: How did she take the gun, did she take it gently or violently or how? Answer: She didn't take it violently. It seems to me she just took hold of the gun.

"Question: Did she give it a pull, do you recall? Answer: Well, I don't know. It seems to me she reached out with her left hand and just took hold of the gun.

"Question: And then what happened? Answer: I think both of my hands were off it, but I don't know."

The bullet went through Betty's midsection and exited on the left side of her back about 3 or 4 inches above the belt line. In the opinion of the ballistics expert, Roger Greene, at the time of the gun's discharge it was directly against Betty's sweater as the powder burns were in the inside of the fabric, the fabric from the bullet hole was missing and had been blown out by the blast and a tear in her sweater suggested that the muzzle of the gun went through the hole after the bullet was fired and tore the garment. The bullet also penetrated the chair in which Betty was sitting at a height of about 32 inches and went into the wall at the back of the chair at a height of about 27 inches. The bullet had a downward course. After the shot Betty moaned, tumbled off her chair and fell on her side on the floor.

When the police viewed the premises early the following morning the gun was lying on the kitchen floor cocked and loaded. An empty shell from the gun was found near the rear of the kitchen about 17 feet away from the scene of the shooting where it had apparently rolled after being ejected from the gun.

Upon seeing his wife slump to the floor defendant rushed to the phone and called the county hospital and told them his wife had been shot, but was referred to the Fairfield Hospital, which defendant contacted immediately. He was told to bring his wife in and the doctors would be contacted. This defendant did by automobile and was met by nurses at the door who had

a gurney ready upon which his wife was placed. Betty was still alive and conscious when taken to the hospital, and made several statements to defendant to the effect: "Honey, I don't want to die, I don't want to die, Honey." "My back hurts me. Put your arm around my back." Then when the family doctor, Dr. Olson, arrived at the hospital, in Betty's presence while she was still conscious, the doctor asked what happened, to which defendant replied, "It was an accident, Bill." Betty made no comment to the reply.

At the time Dr. Olson arrived Dr. Zimmerman was taking Mrs. Freudenberg's blood pressure. Mrs. Freudenberg was in shock and they started giving her plasma. They then gave her transfusions of whole blood. Since her condition was not improving the doctors determined to operate. Doctors Rossi and Gauder were notified and shortly thereafter arrived at the hospital. Mrs. Freudenberg was taken to the operating room, and upon operating the doctors found that her liver had been lacerated about the edge and the transverse colon completely severed in the mid-portion. The second portion of the small bowel in the approximal region of the ligament had been severed and blood was coming from the area of the left kidney hilus. The doctors temporarily repaired the large bowel but were unable to staunch the flow of blood in the abdomen as there was damage to the large blood vessels coming off the aorta, and in spite of transfusions Mrs. Freudenberg died at about 2:15 a.m. from shock, blood loss, and the penetrating injury due to the bullet wound. It was the doctors' opinion that they did everything in their power to prevent Mrs. Freudenberg's death but nothing could have changed the ultimate result of the gunshot wound.

The record shows that an analysis was made of the blood of defendant and Betty to determine the alcoholic content. The sample of defendant's blood was not taken until five hours after Betty was shot and showed an alcoholic content of 0.031 per cent which Dr. Olson testified was a trace only and had no significance as to intoxication. The doctor also testified that the fact that the sample was taken five hours after the incident would cause a slight decrease in the alcoholic content.

The analysis of Betty's blood showed an alcoholic content of 0.163 per cent which Dr. Olson testified would be the border line of intoxication and that "the average person would be intoxicated at that point."

Appellant's first contention is that the motion to quash the indictment should have been granted because the district

attorney presented improper testimony before the grand jury. He then details certain testimony of Betty's father before the grand jury, much of which was highly critical of appellant and much of which would, upon proper objection being made, have been excluded at a trial in court.

While it is true that section 919 of the Penal Code provides in part that "The grand jury can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence," it is also true that section 921 provides that "The grand jury ought to find an indictment when all the evidence before them, taken together, if unexplained or uncontradicted, would, in their judgment, warrant a conviction by a trial jury."

However, the fact that there may have been some incompetent or illegal evidence before the grand jury does not render the indictment void. As was stated in *Stern* v. *Superior Court,* 78 Cal.App.2d 9, at pages 17-18 [177 P.2d 308] :

"Complaint is made that the grand jury received hearsay testimony and other than the best evidence. The hearsay testimony was that of admissions made by other defendants and was admissible against the several defendants who had made such admissions. It is urged that in producing this testimony the district attorney should have informed the grand jury that it could not be considered in determining whether to return an indictment against any other person than the one making the admission. No authority is cited in support of this argument. In the analogous case of a hearing by a committing magistrate it has been held that the production before the committing magistrate of incompetent evidence is immaterial if there is sufficient competent material to justify the committing magistrate in holding the defendant to answer. (*In re Kawaguchi*, 12 Cal.App. 498 [107 P. 727].) Where it appears that sufficient competent evidence was introduced to support the indictment we are satisfied that the indictment is not rendered void by the reception of some incompetent evidence."

And as this court said in *McFarland* v. *Superior Court,* 88 Cal.App.2d 153, at page 158 [198 P.2d 318] (hearing denied) :

"An indictment may not be set aside merely because some incompetent evidence was received by the grand jury, provided there is substantial competent evidence upon which the grand jury is authorized in its judgment to return the indictment. Section 995 of the Penal Code does not authorize the

setting aside of an indictment for insufficiency of evidence, or because incompetent evidence is received or considered. (*Stern* v. *Superior Court*, 78 Cal.App.2d 9, 18 [177 P.2d 308]; *People* v. *Hatch*, 13 Cal.App. 521, 528 [109 P. 1097]; 14 Cal.Jur., § 59, p. 76.) In the Hatch case the district attorney advised the grand jury that there was adequate evidence to warrant the finding of an indictment. The court said:

" '. . . The law contemplates that only competent evidence be received by the grand jury, yet if it should receive incompetent evidence and found an indictment thereon, there is no method of reviewing its action in so doing. An indictment is but an accusatory paper, and it was never intended that on a motion to dismiss, irregularities in the proceedings before the grand jury should be reviewed, except as expressly provided in the statute.' "

Defendant next contends that "the evidence both before the Grand Jury and the trial court was legally insufficient to warrant the indictment or support the verdict." Defendant testified before the grand jury and at the trial, and the evidence before the grand jury was substantially the same as that before the trial court. If there was sufficient evidence to support the conviction there was, of course, sufficient evidence to support the indictment, so we shall treat this contention of defendant as presenting the question of whether or not there is sufficient evidence to support the verdict of manslaughter.

The indictment accused defendant of the crime of manslaughter in that he "did wilfully, unlawfully, feloniously and without malice kill Elizabeth Anne Freudenberg."

Section 192 of the Penal Code, so far as material here, defines manslaughter as follows:

"Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle."

It is clear from the record that the People only sought to prove that defendant was guilty of involuntary manslaughter. The evidence is clear that the deceased died as a result of a bullet wound from the pistol in evidence which belonged to the appellant. The theory of the prosecution was that the

appellant did not use due caution and circumspection in handling the loaded pistol from which a bullet was fired into the deceased. Appellant contends that there is no evidence whatsoever that the pistol was discharged while under his control, or discharged by any act of his at all. He argues that there were no identifiable fingerprints found on the pistol, and the paraffin test for nitrate performed upon appellant was of no value and inconclusive, as was the paraffin test performed upon the deceased. Appellant contends, therefore, that he can in no way be held criminally responsible for the death of the deceased since he did not fire the pistol, nor was it under his control when fired. He points to his testimony that while explaining the mechanism of the pistol to his wife she reached over with her left hand and placed it on the pistol and then followed with her right hand, at about which time the pistol fired, appellant contending that it was not in his hand when fired, nor was his finger on the trigger. Appellant further contends that at no time did he point the muzzle of the pistol toward the deceased, and that the act in reaching for and taking hold of the pistol drew the muzzle toward her body so that any bullet emitting therefrom would be sent into her body.

Defendant then argues that the only evidence that the prosecution had to connect the appellant with the crime was his own statement and admission that he brought the loaded pistol into the room where his wife was sitting, and contends that where the People, to connect a defendant with a homicide, rely upon the statement of the defendant to connect him with the death and where in said statement a set of facts is related which, upon their face, show a defense to the alleged crime, and there is no proof to contradict anything contained in the statement or testimony of the defendant, the People are bound by the defense as related and the proof is insufficient to sustain a conviction. He cites *People* v. *Toledo*, 85 Cal. App.2d 577 [193 P.2d 953]; *People* v. *Estrada*, 60 Cal.App. 477 [213 P. 67]; *People* v. *Salaz*, 66 Cal.App. 173 [225 P. 777]; *People* v. *Coppla*, 100 Cal.App.2d 766 [224 P.2d 828].

Each of the cases cited is factually dissimilar to the case at bar and inapplicable thereto. In *People* v. *Estrada*, 60 Cal. App. 477 [213 P. 67], a judgment of manslaughter was reversed on the ground that the circumstantial evidence fully supported the defendant's claim of self-defense and therefore the verdict was not supported as a matter of law.

In *People* v. *Toledo,* 85 Cal.App.2d 577 [193 P.2d 953], a manslaughter conviction was reversed where the evidence as a matter of law showed the defendant's action to be justifiable as only done in self-defense.

In *People* v. *Coppla,* 100 Cal.App.2d 766 [224 P.2d 828], conviction of bookmaking was reversed on the ground that the record disclosed no evidence that the defendant was engaged in such activity.

In *People* v. *Salaz,* 66 Cal.App. 173, 181 [225 P. 777], a manslaughter judgment was reversed on the ground that evidence was erroneously admitted and by virtue of the closeness of the case, its admission constituted reversible error. However, in this case the court stated with reference to a similar contention raised by the appellant therein as to the necessity for accepting his account of the killing:

"But it does not necessarily follow that appellant's account of the killing, though uncontradicted by direct evidence, should control the jury. If there be any well-established circumstance in the case which may reasonably be regarded as incompatible with the theory of the defense that the killing was justifiable, then the jury, from a consideration of all the evidence, was warranted in finding that the act amounted to an unlawful homicide."

Again, in *People* v. *Jacobs,* 111 Cal.App.2d 281, 283 [244 P.2d 500], the court after setting forth the rule urged by defendant herein rejected it and stated:

"Under the foregoing rule the question presented is: Does the record furnish evidence of any circumstances which cannot reasonably be reconciled with the theory that defendant did not intend to stab her husband? It certainly does."

In the instant case the evidence shows that defendant's wife was on the verge of intoxication. She had no knowledge of firearms. Defendant went from the kitchen to the bedroom, obtained an unloaded gun which he loaded, placed a shell in the chamber which cocked the gun, and then brought this cocked and loaded gun back to the kitchen and offered it to his wife, muzzle first as hereinbefore set forth. The reason given by him for loading and cocking the gun was that he wished to show his wife that he trusted her and that he knew she would never use the gun but would say, "Herman, put it away." Defendant knew that his wife knew nothing about firearms, and so far as she was concerned he could have made his test without loading the gun. He knew the gun was loaded and cocked; he knew his wife was on the

verge of intoxication; he knew that she knew nothing about firearms. Nevertheless, he took this loaded gun back into the kitchen, and holding it by the pistol grip offered it to his wife, muzzle first, but, according to his statement, with the barrel pointing at an angle away from her. This gun was the revolver that defendant had used while a naval officer in World War II, and he was trained in the use and handling of firearms. As the witness Roger Greene of the State Department of Criminal Investigation testified: "If you are going to pass the gun to somebody else you don't pass the gun if you are at all courteous muzzle toward the other fellow." He could have made his test also by offering the gun to his wife butt first. He was not sure whether both his hands were off the gun when it went off, but he did have the gun in his closed hand at the time he offered it to her.

The theory of the prosecution was that defendant handled a dangerous weapon without due caution and circumspection and the case was presented to the jury on that basis, both in the arguments and in the instructions.

In the case of *People* v. *Searle,* 33 Cal.App. 228 [164 P. 819], the court in quoting from 1 Michie on Homicide, page 253, stated at p. 231:

" 'An unintentional homicide committed through the negligent handling of a firearm in a way indicating a reckless disregard of life is manslaughter. It is negligence to point a firearm at another without examining to see whether or not it is loaded, or to handle or use it in a place where a discharge is likely to injure another, as in a highway.' "

In the case of *People* v. *Carmen,* 36 Cal.2d 768, at 776 [228 P.2d 281], the court said:

"Accepting defendant's testimony that he stumbled, and the gun went off, and that he did not intend to shoot or injure anyone, yet he was carrying the gun with a cartridge in the firing chamber, with the gun pointed forward, and approaching a car occupied by persons, the jury would have been justified in concluding that he did not act with 'due caution and circumspection.' A killing is manslaughter where it is done in the commission 'of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (Pen. Code, § 192(2).) It has been held repeatedly that a killing resulting from the negligent handling of firearms may be manslaughter. (*People* v. *Searle,* 33 Cal. App. 228 [164 P. 819]; *People* v. *Hubbard,* 64 Cal.App. 27

[220 P. 315] ; *People* v. *Attema,* 75 Cal.App. 642 [243 P. 461] ; *People* v. *Sidwell,* 29 Cal.App. 12 [154 P. 290] ; *People* v. *Sica,* 76 Cal.App. 648 [245 P. 461].) Under some circumstances a claim supported by evidence that the killing was accidental will not justify an instruction on manslaughter, for the defendant is either guilty of murder or not guilty of any crime. (See *People* v. *Eggers,* 30 Cal.2d 676 [185 P.2d 1].) But here, as above shown, the jury could have found defendant guilty of manslaughter on the ground that the 'accident' was the result of his negligence.''

And in *People* v. *Southack,* 39 Cal.2d 578, the court said at page 584 [248 P.2d 12] :

''The above summarized evidence is sufficient to support a finding of manslaughter, either voluntary in 'heat of passion' (Pen. Code, § 192, subd. 1) or involuntary. The involuntary manslaughter might be 'in the commission of an unlawful act, not amounting to felony' (Pen. Code, § 192, subd. 2), for it could be found that defendant unlawfully exhibited the gun in an angry manner, a misdemeanor (Pen. Code, § 417), or it might be 'in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection' (Pen. Code, § 192, subd. 2), for it could be found that defendant was simply holding the gun but that he was negligent in so doing. (See *People* v. *McGee* (1947), 31 Cal.2d 229, 238 [187 P.2d 706] ; *People* v. *Carmen* (1951), 36 Cal.2d 768, 774 [228 P.2d 281].)''

In view of these authorities and the evidence in the record we are convinced that the jury was fully justified in concluding that in handling the gun in the manner and under the circumstances shown by the record the defendant acted without due caution and circumspection, and that defendant's contention that the verdict of manslaughter is unsupported by the evidence cannot be sustained.

Defendant has challenged the propriety of certain instructions given by the court and its refusal to give certain instructions requested by him. Defendant apparently has disregarded the rule that the instructions must be read together as a whole (8 Cal.Jur., Criminal Law, § 607). At the outset the court instructed the jury that they should ''consider all of the instructions and as a whole, and to regard each in the light of all the others.''

Defendant first urges that the following instruction removed from the jury's consideration the issue of proximate cause and the duty of care and hence was prejudicial error:

"Where the death of a human being results from playing with or the careless handling of a loaded firearm, there being no intent to injure anyone, and the firearm is discharged, the offense is involuntary manslaughter, the killing being caused by the doing of a lawful act without caution and circumspection."

However, immediately preceding the instruction complained of the court gave the following instructions:

"A jury may not find a defendant guilty of any homicide unless the jurors are convinced beyond a reasonable doubt that an unlawful act or unlawful acts by such defendant was or were a proximate cause of the death in question. When that person inflicts upon another a wound which is dangerous or calculated to destroy life and which does proximately cause the death of that other person, the fact if it be a fact, that negligence or mistake or lack of skill of an attending physician or surgeon contributes to the death affords no defense to a charge of homicide."

"The mere fact that an unfortunate and fatal accident happened, in which the defendant, Herman Freudenberg, Jr., was involved, considered alone, does not prove and does not support an inference that the defendant conducted himself without due caution and circumspection. It is incumbent upon us, when determining whether or not a person exercised due caution and circumspection, to consider the facts immediately preceding and all the facts surrounding the occurrence in question and not to be moved to a conclusion solely by the fact of an unfortunate result."

"When a person commits an act or makes an omission through misfortune or by accident under circumstances that show no evil design, intention or culpable negligence, he does not thereby commit a crime, although the same act or omission committed under different circumstances and coupled with criminal intent would constitute a crime."

"If you entertain a reasonable doubt, growing out of the evidence, as to whether the decedent, Betty Freudenberg, came to her death as the result of a gunshot wound inflicted by the defendant Herman Freudenberg, Jr., or as the result of a gunshot wound inflicted by the decedent, Betty Freudenberg, herself, or as the result of a gunshot wound inflicted by accident or misfortune and without culpable negligence on the part of defendant, then I instruct you that the defendant, Herman Freudenberg, Jr., is entitled to the benefit

of any such reasonable doubt, and you must find him not guilty.''

''The doing of an act ordinarily lawful which results in the death of a human being may be manslaughter where the act, being one which might cause death, is performed in an unlawful manner or without due caution or circumspection. When a person is doing anything dangerous in itself or has charge of anything dangerous in its use and acts with reference thereto without taking those proper precautions which a person of ordinary prudence would have used under the circumstances, and the death of another results therefrom, his act or neglect is a criminal act against the person so killed even though his negligence does not amount to a wanton or reckless disregard of human safety or life.''

From the time of the common law, firearms were recognized as a dangerous instrumentality because of their great potential harm and in the interest of the preservation of human life and safety a high degree of care was demanded of those who use them. (*State* v. *Hardie,* 47 Iowa 647 [26 Am. Rep. 496] ; *Reg.* v. *Salmon,* L.R. 6, Q.B.,D. 79 ; *R.* v. *Rampton, Kelyng,* 41; *Potter* v. *State,* 162 Ind. 213 [70 N.E. 129, 102 Am.St.Rep. 198, 64 L.R.A. 942] ; The Law of Homicide, Moreland (1952) p. 103.)

In *People* v. *Searle,* 33 Cal.App. 228, the court said at page 231 [164 P. 819] :

''So, where parties were playing or skylarking and defendant recklessly handled his gun. (*Murphy* v. *Commonwealth* (Ky.), 22 S.W. 649; *Henderson* v. *State,* 98 Ala. 35 [13 South. 146].) In the first-mentioned case the fact that the shot was caused by defendant's finger accidentally slipping on the trigger was held to be an insufficient excuse.''

In the case of *People* v. *Sica,* 76 Cal.App. 648, 651 [245 P. 461], the court after defining manslaughter in the language of section 192 of the Penal Code stated: ''and it has been held in this state, as in others, that where the death of a human being results from playing or skylarking with or the reckless handling of firearms, it is involuntary manslaughter, the killing being the result of the commission of a lawful act which might produce death, without due caution and circumspection.''

Defendant in attacking the complained-of instruction has failed to consider the purport of the instructions immediately preceding this where the jury were told that if they had a reasonable doubt as to whether the death of

the decedent was from a gunshot wound caused by herself or caused by the defendant without culpable negligence they must find him not guilty. Considering this group of the instructions, it does not appear, as defendant contends, that the jury were instructed that merely because the defendant produced a loaded weapon, he was guilty of manslaughter. On the contrary, it appears that the jury were instructed that before they could find him guilty they must be convinced beyond a reasonable doubt that his unlawful acts were a proximate cause of the death.

In the case at bar the admitted facts disclose that the defendant was the one who procured and loaded the weapon as well as brought it back to the room where his wife was seated. There was no question raised as to the shooting being in self-defense nor did defendant deny his presence at the scene of the offense. The discharge of the loaded weapon which the defendant brought into the decedent's presence and displayed to her was the cause of the victim's death.

When the instruction complained of is read together with the instructions given to the jury on proximate cause, reasonable doubt, the type of conduct necessary to constitute involuntary manslaughter, and the detailed instruction on what was meant by lack of due caution and circumspection, it is clear that the court did not err in giving the instruction complained of.

Defendant next contends that the court erred in giving the following instruction:

"Even though the death was by misfortune and accidental, the homicide will not be excused if it was by an unlawful act, or by the doing of a lawful act in an unlawful manner, or without due caution and circumspection."

Defendant argues:

"This instruction is erroneous because it assumes the very fact in issue, the question as to whether a *homicide* had taken place. A *homicide* is the taking of a life by another. The defense contends that decedent took her own life.

"This instruction not only assumes the fact of a killing, but in addition ignores the question of proximate cause and fails to state whose accidental act would serve to fix responsibility on the defendant."

The instruction complained of must be read in the light of the previous instructions defining the particular offense with which defendant was charged and the necessity for defendant

to have acted in such a manner as to constitute a crime before the offense could be proved beyond a reasonable doubt. The jury was fully instructed on the question of proximate cause and it. is readily apparent that the jury rejected the defendant's contention that the decedent shot and killed herself. It should be noted that the court instructed: "A jury may not find a defendant guilty of any homicide unless the jurors are convinced beyond a reasonable doubt that an unlawful act or unlawful acts by such defendant was or were a proximate cause of the death in question."

In view of the other instructions given by the court it is clear that the jury could not have understood from this instruction that the court was stating to them as a fact that a homicide had been committed, and no possible prejudice could have resulted to defendant from the giving of said instruction.

■ There is no merit in defendant's next contention that the court did not properly instruct the jury on proximate cause or intervening cause.

The trial court instructed the jury on the doctrine of proximate cause as follows:

"To find the defendant guilty of involuntary manslaughter, you must find from the evidence that his conduct not only was of a kind described as essential to constitute involuntary manslaughter, by the definition heretofore given, but also that it was a proximate cause of the death involved in this case."

"The proximate cause of an injury is that cause which, in the natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. It is the efficient cause, the one that necessarily sets in operation the factors that accomplish the injury. This does not mean that the law seeks and recognizes only one proximate cause of an injury, consisting of only one factor, one act, one element of circumstances or the conduct of only one person. To the contrary, the acts and omissions of two or more persons may work concurrently as the efficient cause of an injury, and in such cases, each of the participating acts or omissions is regarded in law as a proximate cause."

"A jury may not find a defendant guilty of any homicide unless the jurors are convinced beyond a reasonable doubt that an unlawful act or unlawful acts by such defendant was or were a proximate cause of the death in question. When that person inflicts upon another a wound which is dangerous or calculated to destroy life, and which does proximately cause

the death of that other person, the fact, if it be a fact, that negligence or mistake or lack of skill of an attending physician or surgeon contributes to the death, affords no defense to a charge of homicide."

"The fact that the deceased or some other person was guilty of negligence which was a contributing cause of the death, is no defense to a criminal charge since a criminal prosecution is not an action on behalf of the injured party but for an offense against the State. Negligence of the deceased would be a defense only if such negligence was the sole cause of the death."

Reading these instructions together, it is apparent that the jury was instructed that the defendant could only be convicted if his unlawful acts were the proximate cause of the death and constituted manslaughter. (*People* v. *Marconi*, 118 Cal.App. 683 [5 P.2d 974]; *People* v. *Pociask*, 14 Cal.2d 679 [96 P.2d 788]; *People* v. *Leutholtz*, 102 Cal.App. 493 [283 P. 292]; *People* v. *McKee*, 80 Cal.App. 200 [251 P. 675].)

Defendant complains also that the court erred in adding the italicized portion of the following instruction offered by him:

"If you entertain a reasonable doubt, growing out of the evidence, as to whether the decedent, Betty Freudenberg, came to her death as a result of a gunshot wound inflicted by the defendant, Herman Freudenberg, Jr., or as the result of a gunshot wound inflicted by the decedent, Betty Freudenberg, herself, or as the result of a gunshot wound inflicted by accident or misfortune *and without culpable negligence on the part of the defendant*, then I instruct you that the defendant, Herman Freudenberg, Jr., is entitled to the benefit of any such reasonable doubt, and you must find him not guilty."

The modification of Defendant's Instruction No. 21 did not render the instruction erroneous. ■ If the gunshot wound was inflicted by accident or misfortune but nevertheless by virtue of the culpable negligence of the defendant, the homicide resulting therefrom would be manslaughter for an accidental shooting is not always excusable or justifiable. (26 Am.Jur. 212, p. 301; *People* v. *Kerrick*, 86 Cal.App. 542, 546 [261 P. 756]; *People* v. *Hubbard*, 64 Cal.App. 27 [220 P. 315]; *People* v. *Peters*, 96 Cal.App.2d 671 [216 P.2d 145].)

■ Defendant next contends that since the court instructed the jury on contributory negligence of its own motion, it should have given further instructions to the effect that

while contributory negligence is no defense to a charge of manslaughter, the conduct of the deceased is, however, material to the extent that it bears upon the negligence or wrongful conduct of the accused or on the issue of whether the conduct of the accused was the proximate cause of death. In support of this contention defendant relies on the dissenting opinion in *People* v. *Pociask*, 14 Cal.2d 679 [96 P.2d 788]. However, the majority opinion in the cited case held that the jury was correctly instructed where they were told in substance that negligence of the decedent was no defense; that such negligence would exonerate the defendant only if it was the sole proximate cause of the accident, but that the defendant was not exonerated if the jury found that he was guilty of negligence which proximately contributed to the injuries. Similar instructions were given to the jury in the case at bar.

The trial court was not required to give further instructions on the subjects which were covered by the above instructions. (*People* v. *McKee*, 80 Cal.App. 200 [251 P. 675]; *People* v. *Marconi*, 118 Cal.App. 683 [5 P.2d 974].)

In the case of *People* v. *Haeussler*, 41 Cal.2d 252, 263 [260 P.2d 8], the California Supreme Court in affirming a conviction of manslaughter stated:

"Nor is there merit to the contention that the court committed prejudicial error in failing to instruct the jury that Mrs. Haeussler should be acquitted if the accident were unavoidable or if it were found that the accident was caused solely by the negligence of Lovelace. The jurors were told that, to convict Mrs. Haeussler, they must find misconduct by her to have been the cause of death; also, the occurrence of an accident did not warrant an inference of negligence. There was no legal requirement that the court expressly negative liability in the event that either of these contingencies occurred. (*People* v. *Rodgers*, 94 Cal.App.2d 166, 168 [210 P.2d 71].)"

Under the facts of the case at bar it is fairly inferable that the obtaining and handling of a loaded gun in the manner admittedly done by the defendant herein in and of itself showed a lack of due caution and circumspection, and the result thereof, the death of the deceased, could not be attributed to any supervening or intervening cause but was a proximate result of the negligence of the defendant. Under the facts in the case it would appear that the jury was properly instructed. In the absence of a request by the defendant for additional instructions on the particular point there

was no duty of the court to give additional instructions on specific points. (*People* v. *Nudo,* 38 Cal.App.2d 381 [101 P.2d 162]; *People* v. *Klor,* 32 Cal.2d 658 [197 P.2d 705]; *People* v. *Reese,* 65 Cal.App.2d 329 [150 P.2d 571]; *People* v. *Reed,* 38 Cal.2d 423 [240 P.2d 590].)

The next contention of defendant is that the trial court prejudiced the defendant's rights of cross-examination and removed the issue of causation and proximate cause from the jury's consideration. This contention is utterly without merit. Defendant's counsel cross-examined the doctors at great length in an effort to show that the bullet that penetrated Betty Freudenberg's body and did the extensive damage hereinbefore described was not the cause of her death, and that she died of incompetent and negligent medical treatment. The cross-examination was not curtailed in any way and defendant has not pointed out any question asked by his counsel that was disallowed by the court.

Defendant quotes the following from the record:

"MR. O'HARA: I assume that Mr. Lynch called Dr. Rossi today for one purpose, to show that proper surgical procedure was followed and I believe since he has testified as to his efforts on direct, it is within my province to inquire on cross-examination as to that which he has testified to.

"THE COURT: Counsel, do you agree with this statement, this proposition of law: The fact that the decedent, Mrs. Freudenberg, or some other person, was guilty of negligence which was a contributory cause of the death is no defense to a criminal charge, since a criminal prosecution is not an action on behalf of the injured party, but for an offense against the state. Do you agree with that proposition of law?

"MR. O'HARA: Not only agree with it, but it is the law, your Honor.

"THE COURT: Exactly. And the negligence of the decedent would be a defense only if such negligence was the sole cause of death. Now, what are we going into all this detail about how the operation happened?"

Defendant now contends that the court by the last quoted statement told the jury that the acts of the defendant were the proximate cause of death. We see no error in the statement of the court, and the jury was fully instructed by the court as to the applicable law.

▮▮▮ The general rule as to criminal responsibility of one who wounds another for the death of the victim is stated in 8 American Law Reports 516, as follows:

"When a person inflicts a wound on another which is dangerous, or calculated to destroy life, the fact that the negligence, mistake, or lack of skill of an attending physician or surgeon contributes to the death affords no defense to a charge of homicide."

In the case of *People* v. *McGee,* 31 Cal.2d 229, 240 [187 P.2d 706], the court stated:

". . . On this subject it has been said to be 'the proper, and probably generally accepted, view . . . that mere negligence [in the treating of a wound] is no defense even though it is the sole cause of death because it is a foreseeable intervening cause. But death caused by grossly improper treatment is not the proximate consequence of the defendant's injury unless the injury is an actual contributing factor at the time of death, because such treatment is an unforeseeable intervening cause."

Defendant next urges that since the only direct testimony as to the offense was his and the remainder was circumstantial, he was entitled to his proposed instructions on circumstantial evidence and that the court committed prejudicial error in refusing them.

In this case the fact of death by virtue of a gunshot wound was established by direct evidence. The circumstances surrounding the death were established through the statements of the defendant and through circumstances sometimes at variance with such statements. The defendant himself testified as to the shooting. If the jury, as was its prerogative, disbelieved that portion of defendant's testimony at the trial which was at variance with his prior statements, the offense was established by direct evidence chiefly and the circumstantial evidence was only incidental. The only circumstantial evidence involved was the testimony of the chief of police as to the location of the chairs and gun in the kitchen and the testimony of the expert witness as to the position of the gun when it was fired. The jury were instructed that they were to consider the opinion of duly qualified experts with the reasons given therefor; that they were not bound to accept the opinion of an expert as conclusive; and that they should give to such an opinion the weight to which they found it to be entitled.

Defendant states that the only instruction given by the court on circumstantial evidence was the following:

"If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defend-

ant and the other to his innocence, it is your duty under the law to adopt that interpretation which will admit of the defendant's innocence and reject that which points to his guilt. You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions appears to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt.''

However, the record shows that immediately following the instruction just quoted the court gave an instruction defining the different classes of evidence and specifically stated that ''Indirect evidence is that which tends to establish the fact in dispute by proving another fact which, though true, does not of itself conclusively establish the fact at issue, but which affords an inference or presumption of its existence.''

The court also gave the following instruction:

''Two classes of evidence are therefore recognized and admitted in courts of justice, upon either or both of which, juries may lawfully find an accused either guilty or innocent of an offense charged. Direct evidence consists of the testimony of every witness who, with any of his own physical senses, perceived any conduct or act. All other evidence admitted in the trial is circumstantial, and insofar as it shows acts, declarations, conditions or other circumstances, it may be considered by you in arriving at a verdict. The law makes no distinction between circumstantial evidence and direct evidence, but respects each as a reasonable method of proof.''

The jury was also fully instructed as to the burden of proof, presumption of innocence and doctrine of reasonable doubt, and we are satisfied that no prejudice resulted to defendant by the refusal of the court to give the specific instructions requested by him.

Defendant next contends that the court committed prejudicial error in giving the following instruction:

''It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, whether or not he does testify rests entirely in his own decision. As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts

within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable. The failure of a defendant to deny or explain evidence against him does not, however, create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.''

 Defendant argues that while such an instruction would be proper in cases where defendant did not testify it was improper and could only confuse the jury in the instant case where the defendant testified at great length. While it is true that the defendant did testify at great length it was for the jury to weigh the reasonableness of his explanations and the weight of his testimony generally and we are unable to understand how he could be prejudiced by the giving of said instruction.

In *People* v. *Boggs*, 12 Cal.2d 27 [82 P.2d 368], where a similar instruction was given in a case where the defendant did take the stand and testify, the court stated:

''Obviously, no prejudice could have resulted to the defendant from instruction number 9 in which the jury was merely informed of the right of court and counsel to comment on the evidence or the failure of defendant to explain or deny any portion thereof adverse to him. The instruction was undoubtedly based upon section 13, article I, section 19, article VI of the state Constitution and section 1439 of the Penal Code.'' See, also, *People* v. *Keys*, 62 Cal.App.2d 903, 913-914 [145 P.2d 589].

 Defendant next complains of the following instruction given immediately after the instruction just discussed:

''The defendant is not required to establish any fact which he may undertake to prove beyond a reasonable doubt. If, by his evidence, or the evidence of his witnesses, he raises a reasonable doubt in your mind as to any material fact or element of the charge, this is sufficient and your duty is to acquit the defendant.''

If this were the only instruction given on the subject of burden of proof there might be some basis for a claim of prejudicial error. But the jury was fully instructed on the

general question of burden of proof and the necessity of the prosecution's proving every element of the offense beyond a reasonable doubt. The instruction complained of is one usually offered by a defendant to impress upon the jury the fact that he is not required to establish his defense beyond a reasonable doubt, as his guilt must be proved by the prosecution, but that he is only required to raise a reasonable doubt as to his guilt. When all of the instructions are considered together there was no error in giving the instruction.

Defendant urges also that the court erred in refusing to give instructions offered by him on burden of proof, and that conviction cannot be had on suspicion or outside influences. Since the general instructions given by the court covered the contents of these proposed instructions they were properly refused.

There is no merit in defendant's further contention that the following cautionary instruction was erroneous:

"The law of this state admonishes you to view with caution the testimony of any witness which purports to relate an oral admission of the defendant or an oral confession by him."

The several statements made by defendant were read to the jury and defendant could not have been prejudiced by the court's referring to them as admissions or confessions.

There is no merit in defendant's next contention that in view of the fact that the only direct testimony was that of defendant his instructions 11 and 12 should have been given.

Instruction 11 was as follows:

"I instruct you that the direct evidence of any one witness heard during this trial who is entitled to full faith and credit is sufficient for the proof of any fact in evidence for your consideration. CCP Section 1844."

Instruction 12 was as follows:

"You are instructed that testimony received in the trial of this case which is not inherently improbable, and which is not impeached or contradicted by other evidence, should be accepted as true by you, the jury. *Gomez* v. *Cecena*, 15 Cal. 2d 363 [101 P.2d 477]."

While instruction 11 appears to be a correct proposition of law under Code of Civil Procedure, section 1844, appellant again ignores the rule that instructions must be read together. A reading of all of the instructions given by the court indicates that instruction 11 as offered by defendant was

adequately covered by the court in its charge to the jury, as pointed out by the respondent.

Instruction 12 as offered by defendant also appears to have been covered in substance by the instructions given by the court referred to above. Furthermore, as pointed out by respondent, instruction 12 as offered by defendant does not, standing alone, state a correct proposition of law. While the offered instruction might appear to state a general rule of law, it is not without exception, and to give it without also alluding to the exceptions would appear to be erroneous.

As was stated in *People* v. *Kersten,* 60 Cal.App.2d 624, at page 626 [141 P.2d 512]:

". . . There are exceptions to the general rule that the uncontradicted testimony of a witness to a particular fact is binding on the court. The trial court may give consideration to inherent improbabilities in the statement of a witness, the manner of the witness while testifying and all of the circumstances surrounding the particular fact which is the subject of the inquiry." Thus while the offered instruction may have presented the elements of uncontradicted testimony and inherent improbability, it did not present the elements of the demeanor of the witness, and the other facts which would justify the trier of fact in disbelieving the testimony of an otherwise uncontradicted witness.

Defendant contends further that the trial court erred in instructing on theories that were not involved in the proofs.

The court then instructed the jury that under the indictment the defendant could be convicted, if at all, only of manslaughter. The court then went on to instruct on the code definition of manslaughter, voluntary and involuntary. The court then further instructed:

"Manslaughter is the unlawful killing of a human being without malice. One kind of manslaughter, the definition of which is pertinent in this case, is involuntary manslaughter, *being that which is done in the commission of an unlawful act not amounting to a felony,* or in the commission of a lawful act which might produce death, *in an unlawful manner,* or without due caution and circumspection." (Italics added.)

The court also instructed the jury that they could not find defendant guilty of homicide unless they were convinced beyond a reasonable doubt that *"an unlawful act or unlawful acts* by such defendant was or were a proximate cause of the death in question." Further on, the jury was instructed that the homicide would not be excused if it was *"by an unlawful*

*act,* or by the doing of a lawful act in an *unlawful manner,* or without due caution and circumspection.'' Then, again, the jury was instructed that the ''doing of an act ordinarily lawful which results in the death of a human being may be manslaughter where the act, being one which might cause death, is performed in an *unlawful manner* or without due caution and circumspection.'' (Italics added.)

It is the italicized portions of the above instructions of which appellant complains. It is appellant's contention that it was prejudicial error for the court to inject in the case by way of instructions the element of ''unlawful act'' or ''unlawful manner,'' in that nowhere in the evidence did it appear that the defendant was committing an unlawful act at the time of the death.

Appellant cites *People* v. *Sica,* 76 Cal.App. 648 [245 P. 461], in which the jury was instructed in the language of section 417 of the Penal Code as to the fact that the exhibition of a deadly weapon in a rude, angry, or threatening manner is a misdemeanor. No such instruction was given in this case. The evidence in *People* v. *Sica* disclosed that prior to the shooting the relationship between the boys was amicable, there was no fight or quarrel, and the weapon was not displayed in an angry manner. Hence the appellate court held that since it could not be determined on what theory the jury founded its verdict the giving of such instruction constituted reversible error.

In this case, since no instructions were given by the court as to any possible misdemeanors committed by defendant, it is apparent that the jury believed under the facts of the case that the defendant was liable because of his lack of due caution and circumspection in committing a lawful act.

The jury under the evidence in the case at bar could have found that the defendant committed a lawful act—the obtaining of the gun—but performed it in an unlawful manner, by bringing it to his wife in a loaded condition, with the safety removed, and handing it to her, barrel first, ready to fire, and that such act without question displayed a lack of due caution and circumspection in view of his own statements as well as his testimony. Hence it is apparent that reading the instructions as a whole, defendant was not prejudiced and the jury was properly instructed on involuntary manslaughter.

Defendant's next contention is that the court erred in instructing on the definition of criminal negligence.

Defendant contends that the trial court erred in instructing the jury that the words "criminal negligence" as used in section 20 of the Penal Code and the word "negligence" as used in other penal statutes, as well as the phrase "without due caution and circumspection" do not indicate that the conduct described thereby shall display wantonness or a reckless disregard of the safety of others or wilful indifference but that ordinary negligence is sufficient.

Appellant asserts that this instruction was manifestly error in that it informed the jury that they need find the defendant guilty of "ordinary negligence" only to find criminal negligence or lack of due caution and circumspection on the part of defendant.

In the case of *People* v. *Pociask,* 14 Cal.2d 679 [96 P.2d 788], the court affirmed its previous decision in *People* v. *Wilson,* 193 Cal. 512 [226 P. 5], and the discussion therein as to what want of due caution and circumspection was required to constitute criminal negligence as well as its comments in denying a hearing in the case of *People* v. *Seiler,* 57 Cal.App. 195 [207 P. 396], and stated:

" 'The proper rule deducible from the cases cited in the note above referred to (note following report of *Johnson* v. *State,* 66 Ohio St. 59 [63 N.E. 607, 90 Am.St.Rep. 564], in 61 L.R.A. 277), would seem to be this: That when a person is doing anything dangerous in itself, or has charge of anything dangerous in its use, and acts with reference thereto without taking those proper precautions which a person of ordinary prudence would have used under the circumstances and the death of another results therefrom his act or neglect is a criminal act against the person so killed even though his negligence does not amount to a wanton or reckless disregard of human safety or life. . . .' "

In the Pociask case the case of *People* v. *Hurley,* 13 Cal. App.2d 208 [56 P.2d 978], relied upon by defendant with relation to the definition of criminal negligence was specifically disapproved.

We are unable to agree with defendant's contention that the instruction complained of was erroneous.

Defendant's final contentions are that he is deprived of his liberty without due process of law under both the state and federal constitutional guarantees because (1) the indictment failed to notify him of the charge he was called upon to defend; and (2) the verdict of the jury was legally insufficient to support the judgment.

As hereinbefore stated defendant was charged with the crime of manslaughter in that he did wilfully, unlawfully, feloniously and without malice kill one Elizabeth Anne Freudenberg.

In the case of *People* v. *Dobbs,* 70 Cal.App.2d 261 [161 P.2d 46], the indictment similarly charged the defendant who made the same objection thereto as the instant defendant. In answering this contention the court cited *People* v. *Herbert,* 6 Cal.2d 541 [58 P.2d 909], which case held:

"The ingredient of manslaughter is that a human life was unlawfully taken. ·. . . The statute defining it is general and it makes no difference as to the particular means or methods by which it is committed if death ensues from the commission of an unlawful act not amounting to a felony, or from the commission of a lawful act which might produce death in an unlawful manner or the commission of a lawful act without due care and circumspection. (Sec. 192, Pen. Code.) The manner of its commission need not be pleaded."

In the Dobbs case the court, at page 266, went on to state:

"In *People* v. *Pearne,* 118 Cal. 154 [50 P. 376], the court said: 'If this indictment had simply charged an "unlawful killing," without malice, it would have charged the crime of manslaughter of both kinds, voluntary and involuntary.' Even before the rules of pleading in criminal cases were relaxed by the amendments of 1927 and 1929 it was held sufficient to allege an offense in the language of the statute except in cases where fraud was an essential element of the crime. (*In re Berto,* 195 Cal. 774 [235 P. 735].) In many cases, before and after those amendments, it was held that a general charge of manslaughter was sufficient to uphold a conviction of either voluntary or involuntary manslaughter, that it was not necessary to allege in the information which of the two kinds of manslaughter were charged against the defendant, and that no recital of the precise facts that would be relied upon is necessary."

Therefore, in the instant case the indictment would appear to be sufficient in pleading, under the above rule.

Furthermore, defendant did not demur to the indictment nor did he make a motion in arrest of judgment; hence he may not urge any defect appearing on the face of the indictment for the first time on appeal. (*People* v. *Reimringer,* 116 Cal.App.2d 332 [253 P.2d 756] ; *People* v. *Hinshaw,* 194 Cal. 1, 9 [227 P. 156] ; *People* v. *Ahern,* 113 Cal.App.2d 746, 750 [249 P.2d 63].)

Defendant contends that the verdict is insufficient to support the judgment in that he was found guilty only of "Felony, to wit: Manslaughter, as charged in the indictment." Defendant argues that since the verdict did not specify the degree of manslaughter of which he was found guilty a judgment could not be supported thereby. However, the point raised was decided contrary to defendant's contention in the case of *People* v. *Bones*, 35 Cal.App. 429 [170 P. 166]. In that case the defendant was charged by information substantially the same as the instant defendant was charged by indictment. In that case the defendant made the same objection to the form of the verdict returned by the jury as did the defendant in the instant case. In that case the verdict of the jury was also that the defendant was guilty of manslaughter, without specifying the degree. There, however, the court rejected the defendant's contention, saying, at page 434:

"We think the evidence was such as to have justified the court in submitting to the jury a form of verdict for both voluntary and involuntary manslaughter; but it cannot be said that the defendant was prejudiced by the failure of the court to do so. The punishment for manslaughter of either kind is the same, viz., by punishment in the state prison not exceeding ten years (Pen. Code, sec. 193), and we cannot say that the punishment imposed upon the defendant would have been any less or different from that meted out by the court had the jury found and returned a verdict specifically finding the defendant guilty of involuntary manslaughter."

We therefore conclude that defendant's contention that the verdict is insufficient is without merit. Moreover, it should be noted that no objection to the form of the verdict was made by way of motion for a new trial and hence such objection may not now be raised for the first time on appeal. (*People* v. *Caberera*, 104 Cal.App. 414 [286 P. 176] ; *People* v. *Chiappelone*, 90 Cal.App. 472 [265 P. 976]; *People* v. *Cornell*, 29 Cal.App. 430 [155 P. 1026] ; *Curtis* v. *San Pedro Transp. Co.*, 10 Cal.App.2d 547 [52 P.2d 528] ; *Johnson* v. *Visher*, 96 Cal. 310 [31 P. 106].)

In view of the earnest and able arguments presented by defendant's counsel in their briefs aggregating 160 pages, and of the numerous contentions made by them we have made a careful study of the entire record. We are convinced that the defendant was given a fair and impartial trial, that he was ably defended, that the instructions given to

the jury by the court were full, fair and complete, and that the record is singularly free from error. As hereinbefore pointed out we are convinced that the judgment of conviction is amply supported by the record. Having in mind the provisions of section 4½ of article VI of our state Constitution that no judgment shall be set aside on the ground of misdirection of the jury or error in the introduction or rejection of evidence or for error as to any matter of pleading, "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice," we believe that, even if defendant is correct in some of his claims of error, no miscarriage of justice has resulted.

The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.