Filed 11/7/14  P. v. McKoy CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LYNDON RUSHELL McKOY,<br><br>    Defendant and Appellant. | F065513<br><br>(Super. Ct. No. BF135087A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Alice Su, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION[1]

Defendant Lyndon Rushell McKoy was charged with first degree murder, three counts of attempted murder, discharging a firearm at an occupied vehicle, and being a felon in possession of a firearm. A number of further allegations were also made. Prior to trial, defendant pled no contest to being a felon in possession of a firearm. Following jury trial, defendant was convicted of second degree murder and negligently discharging a firearm (both lesser included offenses of the greater charged offense). He was acquitted of the attempted murder charges. Defendant was sentenced to a total of 40 years to life.

On appeal, defendant argues the trial court erred in failing to instruct the jury regarding a lesser included offense to murder—that an unintentional and nonmalicious killing during a felonious assault constitutes involuntary manslaughter. Further, defendant contends there was insufficient evidence to support his conviction for second degree murder.

In affirming defendant's conviction, we find the trial court did not commit instructional error. Moreover, we find defendant's conviction for second degree murder to be supported by sufficient evidence.

## FACTUAL BACKGROUND

### The Testimony of the Passengers in the GMC Yukon

About 9:30 p.m. on December 29, 2010, Nathaniel Jones III (driver), his cousin Artis Hammond (front seat passenger), stepson Shaahid Robinson (back seat passenger) and son Nathaniel Bruce Jones[2] (Little Nate; back seat passenger) placed orders at the

---

[1]When defendant filed his opening brief in April 2013, the California Supreme Court had not yet issued its opinion in *People v. Bryant*, considering whether a killing without malice in the commission of an inherently dangerous assaultive felony could be voluntary manslaughter. That opinion was filed June 3, 2013 (*People v. Bryant* (2013) 56 Cal.4th 959). In his reply brief of August 2013, defendant incorporated and presented argument relative to the *Bryant* decision, and refined the arguments presented in the opening brief on that basis. Hence, our focus is on those arguments that remain viable in the wake of the *Bryant* decision.

[2]At the time of trial in May 2012, Shaahid Robinson was 15 years old and Little Nate was 12 years old. Shaahid's mother was in a relationship with Jones so Shaahid thought of Jones as his stepfather and Little Nate as his stepbrother.

drive-through window of a Taco Bell restaurant in Bakersfield. While Jones was checking the accuracy of their orders, and before leaving the drive-through lane, the driver of a white Saturn sedan in line behind Jones's Yukon honked his horn[3] or otherwise expressed his displeasure with having to wait.[4] That driver was identified as defendant.[5] A verbal altercation occurred between Jones and defendant before the two departed the drive-through lane.

Specifically, Jones exited the Yukon and walked back toward defendant's Saturn. Hammond exited the Yukon shortly thereafter. Shaahid opened his door, but did not get out of the Yukon; Little Nate did not exit the vehicle. Words were exchanged. Shaahid heard defendant say he wanted to go home; Little Nate heard his dad and defendant arguing, but he could not hear specifics. When Hammond walked up, the conversation between Jones and defendant was over. Hammond asked the driver if his passenger was his daughter or his girlfriend. When defendant replied affirmatively, Hammond testified: "I put my hands up like I'm sorry, I didn't mean, you know, to get you in harm or nothing 'cause it's no big deal, you know what I mean." Both he and Jones then returned to the Yukon. Eventually both vehicles exited the Taco Bell drive-through. Hammond believed the Saturn headed toward the exit and onto H Street.

Jones then parked the Yukon at a HomeTown Buffet located in the same lot as the Taco Bell. Shaahid and Little Nate testified that Jones got out of the Yukon to fix the driver's side window, whereas Hammond recalled Jones stopping because the vehicle was overheating.[6] All three passengers agreed Jones had exited the Yukon and was

---

[3]Subsequent testimony indicated the Saturn was either not equipped with a horn, or the horn did not work.

[4]Shaahid testified defendant "flipped off" Jones. On cross-examination, Little Nate recalled telling the detective that the suspect "flipped his dad off."

[5]Shaahid and Little Nate identified defendant as the driver of the Saturn. Hammond was asked if the driver of the Saturn was in the courtroom and he replied "no."

[6]In the defense case, a detective testified the Yukon would not start in the police yard on January 5, 2011, and it had to be jump started.

outside of the vehicle when defendant returned. Defendant pulled the Saturn in behind the Yukon. No words were exchanged between the two on this occasion. Defendant got out of his car and began shooting. Shaahid grabbed Little Nate to cover him; Little Nate ducked. Hammond was telling both boys to get down, and pushing them with his hand. A window was shattered by the gunfire. Defendant got back into the Saturn and drove off. Shaahid and Little Nate ran into the nearby Rusty's Pizza to call police. Hammond checked on Jones. Jones did not survive.

### *The Testimony of the Passenger in the Saturn*

Rena Horns had dated defendant for two years and they lived together in Bakersfield. On the evening of December 29, 2010, she and defendant went to Taco Bell. In the drive-through lane, the occupants of a Yukon ahead of them were taking a long time. Defendant flashed his headlights, signaling the driver to move. As a result, defendant and a number of individuals in the Yukon became involved in a verbal altercation.

In response to the flashed headlights, the Yukon's driver exited and stepped back toward the Saturn's hood. He asked, "'[W]hat's your problem, I'll move when I'm ready,'" "'why are you getting out the car, like you hard,'" and "'you don't want that, you don't want none.'" Horns said another two men exited the Yukon. Defendant, who was standing by the driver's side door of the Saturn, replied he was just trying to get his food so he could go home. One of the others who exited the Yukon asked defendant if Horns was his girlfriend. Defendant said yes, and the Yukon occupants laughed and got back in the vehicle.

Instead of pulling away and simply exiting the drive-through, however, the driver of the Yukon would press the brakes and stop, moved forward again, then press the brakes and stop. Horns told defendant "let's go, let's go," once they got past the Yukon. Defendant exited the parking lot onto the street, but then went behind the building that housed HomeTown Buffet and Rusty's Pizza. Once behind the building, he parked, got out of the car, and opened the trunk. Horns did not see what defendant retrieved from the

trunk. However, when he got back in the car, defendant said, "'I'm gonna blast that fool, he's following us, stuff like that.'" Horns again told defendant, "let's go, let's go home, forget about it." Instead, defendant drove back to the main parking lot and stopped behind the Yukon.

The driver of the Yukon was standing outside of the vehicle. He "kinda, you know, put his hand as if he was reaching for something." That was when defendant began shooting. Horns never saw a weapon that evening. She testified defendant was "scared, worried, [and] angry" that night.

After the shooting, Horns and defendant left the parking lot and went home, where they stayed for the remainder of the evening.

### The Events Following the Shooting

Following an autopsy, it was determined the victim's death was caused by multiple gunshot wounds. More specifically, Jones suffered the following: a penetrating wound to the left groin, pelvic cavity and hip; a perforating wound to the pelvis; a perforating distant-range wound of the left hand; and a perforating distant-range wound of the left fourth finger. The pelvic area wounds compromised the left and right iliac arteries and veins, resulting in major blood loss.

Bakersfield Police Detective Kevin Findley was lead investigator. He was assisted by Detective James Moore. Two shell casings were found at the scene near the Yukon. A third shell casing was recovered later from the Saturn. Bullet fragments were also recovered during the victim's autopsy. Further, a bullet struck the passenger side console or dash of the Yukon and eventually a bullet fragment was recovered from that area.

Bakersfield Police Officer Kenneth Sporer was taking part in a grid search of nearby neighborhoods the day after the shooting. Police were trying to locate a white Saturn sedan matching the suspect vehicle description. Sporer found a vehicle matching the description in the 4300 block of Vern Street; he notified Detective Findley. Thereafter, defendant and another individual were observed getting into the vehicle while

5.

it was under surveillance. The Saturn was stopped by law enforcement. Defendant and his passenger Horns were subsequently arrested and questioned.

Horns gave a statement to Findley. She told him defendant was angry that night; she never told the detective defendant was scared or worried. Horns permitted detectives to search the room she shared with defendant and directed them to a firearm located underneath a dresser. Ballistics tests showed the shell casings found at the scene of the incident and in the Saturn matched the weapon found in the room defendant shared with Horns.

Findley interviewed defendant twice; an audio recording of the second interview was played for the jury. In that statement, defendant admitted "yelling" at the occupants of the Yukon to move. He flashed his headlights but the Yukon did not move enough to allow him to exit. Defendant told Findley that he then "said something like um hurry up mutha fuckin nigga." The driver hopped out, the passenger door opened, and then "they were just talking shit" to him, standing near the hood of defendant's car. Horns tried to convince defendant to let it go. Instead, he got out of the car and the Yukon's driver "kept saying you don't want this you don't want this you don't want none of this." Defendant stated he just wanted to go home and eat. The Yukon occupants returned to their vehicle as if to leave, but they stopped and started the vehicle, "trying to aggravate" defendant. Defendant continued to flash his headlights. Eventually the Yukon and its driver "finally … just moved off and … he made a left and he stopped." Defendant then parked in front of Taco Bell to eat, but the Yukon occupants "stopped right in front of [them]" and the driver got out of his vehicle again as if to come after defendant and Horns. Both parties then took off again. When defendant passed the Yukon, he "was already mad" and feeling disrespected.

In that statement to Findley, defendant admitted telling Horns he was "going to blast him like I'm going to blast him." Horns told him not to do it, but defendant stopped, opened the trunk, got the gun, and noticed the Yukon parking. Defendant then went around and parked his car where he could see the Yukon. He cocked the gun and

the driver got out of the Yukon.  Defendant thought the driver was reaching for something.[7]  He wanted to scare him.  And then defendant "just started shooting."  He recalled letting "two off" and seeing the driver fall to the ground.  Then defendant jumped back in his car and took off "through the back streets" until he and Horns reached home.  Once home, defendant hid the Smith & Wesson nine-millimeter handgun under his dresser.

Defendant claimed what he meant by wanting to "blast them" was that he "wanted to shoot these guy[s]" because he believed if he did not have the gun and if Horns was not present, they would have fought him or jumped him.  He got upset and knowing he had the gun made it an "easier choice," although he did not intend to "kill the guy."  Defendant said the driver did "something with his sweater," leading defendant to believe he, too, had a gun.  Defendant claimed he did not say anything to the driver, but the driver was saying "I told you, you don't want none of this" before defendant began shooting.  Further, defendant did not realize there were kids in the Yukon; he thought the occupants were all adults.  As they left the area after the shooting, Horns told defendant there had been kids inside the Yukon.

Defendant told Findley he knew what he was doing was wrong.  But he wanted to "prove a point" that he should not be underestimated.  Defendant thought he shot the driver in the arm.  He admitted again that he told Horns he was going to "blast him" and repeated he did not intend to kill the driver.  Defendant was not under the influence of drugs or alcohol; he was just angry.

## DISCUSSION

### I.    The Alleged Instructional Error

Defendant contends the trial court failed to properly instruct the jury regarding manslaughter.  Relevant here, the jury was instructed regarding the general principles of homicide, first and second degree murder with malice aforethought, first degree murder,

---

[7]No one in the Yukon had a gun.

voluntary manslaughter: heat of passion, and voluntary manslaughter: imperfect self-defense.  (CALCRIM Nos. 500, 520, 521, 570, 571.)

*Applicable Legal Standards*

"Murder is the unlawful killing of a human being … with malice aforethought." (Pen. Code,[8] § 187, subd. (a).)  Murder is divided into first and second degree murder. (§ 189; *People v. Chun* (2009) 45 Cal.4th 1172, 1181.)  First degree murder is a "willful, deliberate, and premeditated killing."  (§ 189.)  "Second degree murder is defined as the unlawful killing of a human being *with malice aforethought*, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder.  [Citations.]"  (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102; see *People v. Swain* (1996) 12 Cal.4th 593, 600.)  There are three theories of second degree murder:  unpremeditated murder with express malice; implied malice murder; and second degree felony murder.  (*People v. Swain*, *supra*, at p. 601.)

Malice aforethought "may be express or implied."  (§ 188.)  Malice may be, and usually must be, proved by circumstantial evidence.  (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945–946; *People v. James* (1998) 62 Cal.App.4th 244, 277.)  Malice is express "'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.'"  (*People v. Swain*, *supra*, 12 Cal.4th at p. 600; *People v. Nieto Benitez*, *supra*, 4 Cal.4th at p. 102.)  "Express malice murder requires an intent to kill. [Citations.]"  (*People v. Bohana* (2000) 84 Cal.App.4th 360, 368.)  Malice is implied "'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'' [citation]."  (*People v. Lasko* (2000) 23 Cal.4th 101, 107; see *People v. Swain*, *supra*, at p. 602.)  Implied malice does not require an intent to kill.  (*People v. Lasko*, *supra*, at p. 107; *People v. Bland* (2002) 28 Cal.4th 313, 327.)  A defendant acts with implied malice

_____

[8]Further statutory references are to the Penal Code unless otherwise indicated.

8.

when he acts with an awareness of endangering human life.  (*People v. Knoller* (2007) 41 Cal.4th 139, 143, 153.)

Both voluntary and involuntary manslaughter are lesser included offenses of murder.  (*People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Rios* (2000) 23 Cal.4th 450, 460.)  "The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder.  [Citation.]"  (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

### Voluntary Manslaughter

Initially, defendant argued that the trial court erred in failing to sua sponte instruct the jury on the lesser included offense of voluntary manslaughter, where the killing was the result of an inherently dangerous assault committed in the absence of malice.  Defendant relied upon *People v. Garcia* (2008) 162 Cal.App.4th 18 to support his argument.

In *Garcia*, the defendant assaulted the victim with the butt of a gun, causing the victim to strike his head on the pavement and suffer fatal injuries.  The defendant argued he had only meant to hurt the victim and not to kill him.  The jury was instructed on murder and the lesser included offense of voluntary manslaughter based on provocation or imperfect self-defense.  The defendant was convicted of voluntary manslaughter.  On appeal, the defendant argued the trial court had a sua sponte duty to instruct the jury on involuntary manslaughter because there was substantial evidence the victim was killed without malice, i.e., without either an intent to kill or a conscious disregard for human life.  (*People v. Garcia*, *supra*, 162 Cal.App.4th at p. 26.)  That court rejected the defendant's involuntary manslaughter argument.  In doing so, however, *Garcia* stated that "an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter."  (*Id*. at p. 31.)

As noted earlier, after defendant filed his opening brief in this matter, on June 3, 2013, the California Supreme Court issued its opinion in *People v. Bryant*, *supra*, 56 Cal.4th 959.  The high court rejected the Fourth District Court of Appeal's interpretation

9.

of voluntary manslaughter and disapproved *Garcia*. *Bryant* explained: "A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter. [Citation.]" (*People v. Bryant*, *supra*, at p. 968.) "Although we have on occasion employed somewhat different formulations to define the offense of voluntary manslaughter, we have never suggested that it could be committed without either an intent to kill or a conscious disregard for life." (*Id*. at p. 969.)

*Bryant* clarified that the court had never held "that a defendant may be found guilty of voluntary manslaughter when he kills unintentionally *and* without conscious disregard for life." (*People v. Bryant*, *supra*, 56 Cal.4th at p. 970.)

> "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life. To the extent that *People v. Garcia* … suggested otherwise, it is now disapproved. [¶] Because a killing without malice in the commission of an inherently dangerous assaultive felony is not voluntary manslaughter, the trial court could not have erred in failing to instruct the jury that it was." (*Ibid*.)

In light of the foregoing, any argument that the trial court was required to instruct the jury on *Garcia*'s nonstatutory version of voluntary manslaughter is foreclosed. Clearly then, there was no error in this case as the trial court did not have a sua sponte duty to so instruct the jury.

### *Involuntary Manslaughter*

Recognizing the *Bryant* decision forecloses his claim of instructional error regarding voluntary manslaughter, defendant's reply brief focuses instead on an argument that the trial court was required to instruct the jury sua sponte regarding involuntary manslaughter. He reasons if *Bryant* held such conduct is not voluntary manslaughter, then it could only be *involuntary* manslaughter.

"Involuntary manslaughter is manslaughter during 'the commission of an unlawful act, not amounting to a felony,' or during 'the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) 'The offense of involuntary manslaughter requires proof that a human being was killed and that the killing was unlawful. [Citation.] A killing is "unlawful" if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful but which involves a high risk of death or bodily harm, and which is done "without due caution or circumspection."' [Citation.]" (*People v. Murray* (2008) 167 Cal.App.4th 1133, 1140.) There also exists a nonstatutory form of the offense based on the predicate act of a noninherently dangerous felony committed without due caution and circumspection. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007.)

"[C]riminal negligence is the governing mens rea standard for all three forms of committing the offense. [Citations.]" (*People v. Butler*, *supra*, 187 Cal.App.4th at p. 1007.) Criminal negligence consists of "'aggravated, culpable, gross, or reckless' conduct that creates a high risk of death or great bodily injury and that evidences a disregard for human life or indifference to the consequences of the conduct. [Citations.]" (*People v. Garcia*, *supra*, 162 Cal.App.4th at pp. 27–28.)

As noted above, *Garcia* addressed whether the trial court in that case had a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense of murder, where the defendant hit the victim in the face with the butt of a shotgun. (*People v. Garcia*, *supra*, 162 Cal.App.4th at p. 22.) *Garcia* clarified that an unlawful killing during the commission of an inherently dangerous felony was not involuntary manslaughter. (*Id*. at p. 31.) *Garcia* concluded the court did not have a sua sponte duty to give involuntary manslaughter instructions because the defendant's conduct constituted either assault with a deadly weapon or assault with a firearm, and both offenses were inherently dangerous felonies. (*Id*. at pp. 22, 31–32.)

11.

While *Bryant* rejected *Garcia*'s analysis of voluntary manslaughter, the majority opinion declined to address *Garcia*'s analysis of involuntary manslaughter. (*People v. Bryant*, *supra*, 56 Cal.4th at pp. 970-971.) We acknowledge that Justice Kennard filed a concurring opinion wherein she found an assault with a deadly weapon can constitute an unlawful act that makes a killing which occurs during the assault an involuntary manslaughter. (*Id*. at pp. 971-974 (conc. opn. of Kennard, J.).) Justice Kennard believed "a killing committed during an unlawful act amounting to a felony is involuntary manslaughter, notwithstanding the appearance of the phrase 'not amounting to felony' in section 192's subdivision (b)." (*Id*. at p. 974.) In reaching this conclusion, however, Justice Kennard further found the trial court in *Bryant* did not have a sua sponte duty to instruct on this theory of involuntary manslaughter, because it was based "on a legal principle that has been so 'obfuscated by infrequent reference and inadequate elucidation' that it cannot be considered a general principle of law. [Citation.]" (*People v. Bryant*, *supra*, at p. 975.)

In any event, while a homicide may constitute involuntary manslaughter if it occurs during the commission of a *misdemeanor* inherently dangerous to human life, assault with a deadly weapon is an inherently dangerous *felony*. (*People v. Bryant*, *supra*, 56 Cal.4th at p. 966.) Defendant had just engaged in a verbal altercation with occupants of a vehicle ahead of him in the drive-through lane at Taco Bell. Instead of returning home once the involved parties departed and went their separate ways, defendant elected to pull over and retrieve a gun from the trunk of his car. Ignoring his girlfriend's pleas to go home, defendant found the Yukon in front of a nearby restaurant. He parked his vehicle nearby, got out, and began shooting at the driver. After striking his target, defendant got back into his car and left the area. In this case, defendant was a felon in possession of a firearm, who then used that firearm against an unarmed man, killing him.

An involuntary manslaughter instruction was not warranted under the facts of this case. An instruction on a lesser included offense is not required if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense. (*People v. Kelly*

12.

(1990) 51 Cal.3d 931, 959.)  A manslaughter theory requires the killing be committed without malice (*People v. Cook*, *supra*, 39 Cal.4th at p. 596), whereas the evidence in this case showed implied malice.  As explained *ante*, malice is implied "'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' [citation]."  (*People v. Lasko*, *supra*, 23 Cal.4th at p. 107; see *People v. Swain*, *supra*, 12 Cal.4th at p. 602.)  A defendant acts with implied malice when he or she acts with an awareness of endangering human life.  (*People v. Knoller*, *supra*, 41 Cal.4th at pp. 143, 153.)

Defendant ignores the evidence establishing implied malice in his case.  Prior to shooting and killing Jones, defendant and the victim had been involved in a verbal altercation.  Defendant was angry and told Horns he was "gonna blast that fool."  By that time, the Yukon was parked near HomeTown Buffet and defendant had exited the parking lot onto the street.  Defendant made the "gonna blast that fool" comment after retrieving an object from the trunk of his car—a loaded nine-millimeter handgun he used to kill Jones.  There is no doubt defendant intended to shoot Jones.  He admitted as much to Findley.

Defendant's argument that he did not know shooting someone in the arms or legs, or his claim he did not know a bullet piercing the iliac vein would result in one's death, misses the mark.  Firearm use itself—regardless of one's aim—is known to be dangerous to human life.  (Accord, *People v. Hansen* (1994) 9 Cal.4th 300, 311, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1199 ["The tragic death of innocent and often random victims, both young and old, as the result of the discharge of firearms, has become an alarmingly common occurrence in our society—a phenomenon of enormous concern to the public"]; *People v. Nieto Benitez*, *supra*, 4 Cal.4th 91 [brandishing loaded firearm in a threatening manner constitutes a sufficiently dangerous act to support finding of implied malice]; *People v. Tophia* (1959) 167 Cal.App.2d 39, 45, abrogated on other grounds by *People v. Cox* (2000) 23 Cal.4th 665, 675 ["It is

13.

universally accepted that a loaded gun is so dangerous an instrument that a high degree of caution and circumspection is required of the person handling it"]; *People v. Freudenberg* (1953) 121 Cal.App.2d 564, 580 ["From the time of the common law, firearms were recognized as a dangerous instrumentality because of their great potential harm and in the interest of the preservation of human life and safety a high degree of care was demanded of those who use them"].) Further, defendant admitted knowing what he did was wrong. He should not now be heard to complain he lacked sufficient medical knowledge in order to understand the dangerousness of his actions. We think any reasonable juror would have concluded defendant's act of firing his gun was highly dangerous, that defendant could not have been ignorant of the danger, and that he acted with conscious disregard for human life.

Moreover, intentionally firing a shot at a victim at close range is an act dangerous to human life and presents a high probability of death, so it is sufficient to establish implied malice, even if the jury did not find an intent to kill. (*People v. Woods* (1991) 226 Cal.App.3d 1037, 1048.) Here, the victim was "pushing [defendant's] buttons" and defendant felt like he had been "punked in front of [his] girlfriend." Defendant wanted to shoot at the victim. When he fired the three shots at Jones, defendant estimated he was 25 to 30 feet away.[9] Firing three shots at the victim from that distance demonstrated an intentional act, inherently dangerous to human life, done without regard to the consequences. This evidence establishes implied malice, even assuming the jury accepted defendant's statements that he did not intend to kill Jones. Also, implied malice can be found when a defendant willfully discharges a firearm with gross negligence in violation of section 246.3. (E.g., *People v. Clem* (2000) 78 Cal.App.4th 346, 353 ["However, a killer who violates section 246.3 'is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it'"].) Defendant was convicted of that offense as well.

---

[9]Hammond estimated the distance to be about 15 feet.

Even if we were to assume the evidence supported the giving of an involuntary manslaughter instruction, the trial court did not err in failing to give such an instruction sua sponte.

In *Bryant*, the California Supreme Court remanded the matter for further proceedings following its reversal of the Fourth Appellate District's original holding. (*People v. Bryant*, *supra*, 56 Cal.4th at p. 971.) On December 18, 2013, after remand, and after briefing was completed in this case, the Fourth District issued its opinion addressing the outstanding issue: whether a trial court has a sua sponte duty to instruct a jury that an unlawful killing committed without malice in the course of assaultive felony is involuntary manslaughter. (*People v. Bryant* (2013) 222 Cal.App.4th 1196, 1200 (*Bryant II*), review den. Apr. 30, 2014, S216703.)

In *Bryant II*, the Court of Appeal determined the trial court did not err in failing to instruct the jury sua sponte that an unlawful killing committed in the absence of malice during an assaultive felony is involuntary manslaughter because a trial court is not required to instruct on novel legal theories or those that have not been explained or clarified. In so holding, that court relied upon the Supreme Court's earlier decisions in *People v. Flannel* (1979) 25 Cal.3d 668 and *People v. Michaels* (2002) 28 Cal.4th 486. (*Bryant II*, *supra*, 222 Cal.App.4th at pp. 1203-1205.) The Fourth Appellate District concluded that in "light of the lack of authority in support of either theory of involuntary manslaughter, it is clear that pursuant to the Supreme Court law cited above, the trial court did not have a sua sponte duty to instruct the jury that an unlawful killing committed without malice in the course of an assaultive felony constitutes the crime of involuntary manslaughter." (*Id.* at p. 1206.) We agree with the Fourth District that there is no authority requiring a trial court to instruct a jury on involuntary manslaughter where the unlawful killing was committed without malice during the course of an assaultive felony.

Defendant's sole support for his claim is Justice Kennard's concurrence in *People v. Bryant*, *supra*, 56 Cal.4th at pages 971 through 974, finding a killing during an assault

with a deadly weapon to be involuntary manslaughter. Yet, """"no opinion has value as a precedent on points as to which there is no agreement of a majority of the court. [Citations.]"""" (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231.) Thus, because no other justice joined Justice Kennard's concurring opinion in *Bryant*, it lacks precedential value. (*Ibid*.)

Because the evidence presented at trial did not support an involuntary manslaughter instruction, defendant's alternative claim of ineffective assistance of trial counsel for failing to request that instruction also fails. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836 [counsel did not render ineffective assistance because instructions at issue were factually and legally unsupported].)

In summary, the trial court here was not required to instruct the jury regarding the lesser included offense of involuntary manslaughter because (1) the evidence did not warrant such an instruction, and (2) defendant's theory does not amount to a generally accepted legal principle triggering the trial court's sua sponte duty. Hence, the trial court did not err.

## II. The Sufficiency of the Evidence

Next, defendant contends "taking into account the jury's acquittals … there is no substantial evidence to support any conviction above manslaughter" (capitalization omitted), and thus his conviction for second degree murder cannot stand.

### *Legal Standards*

In assessing a claim of insufficiency of the evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. It is the jury that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might

also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320; *People v. Johnson* (1980) 26 Cal.3d 557, 576-577.)

In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts. We examine the record as a whole in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) If the verdict is supported by substantial evidence, a reviewing court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

An appellate court must accept logical inferences that the jury might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429; see *People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

As has already been stated, second degree murder is an unlawful killing of a human being with malice aforethought, yet without the willfulness, premeditation, and deliberation that would support a conviction for murder in the first degree. (*People v. Nieto Benitez*, *supra*, 4 Cal.4th at p. 102.) Malice may be either express or implied. Express malice exists when there is a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears or when the circumstances attending the killing show an abandoned and malignant heart. (§ 188.) "Malice is implied … when a killing results from an intentional act, the natural

consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (*People v. Cook*, *supra*, 39 Cal.4th at p. 596.)

*Our Analysis*

Considering the entire record, and reviewing the evidence in the light most favorable to the judgment—the conviction of second degree murder—we conclude the evidence is sufficient to support the conviction. Defendant unlawfully killed Jones with malice aforethought.

Specifically, there is ample evidence of implied malice sufficient to support the jury's verdict. Jones's death resulted from defendant's intentional act of firing his nine-millimeter handgun at Jones. Defendant performed that act following a verbal confrontation involving the victim in the Taco Bell drive-through line. After that confrontation, defendant was angry and felt disrespected. He reacted by pulling his vehicle over to retrieve a loaded handgun from the trunk. He ignored his girlfriend's pleas to return home and told her he was going to "blast that fool." Defendant "cocked back the gun" and found the victim's vehicle parked nearby. He parked his own vehicle behind the victim's before stepping out and reaching across the "top of the hood" to fire his weapon at the unarmed victim.[10]

Defendant's act was intentional, the natural consequences of which were dangerous to human life. (*People v. Read* (1983) 142 Cal.App.3d 900, 903 [firing a weapon at another human being is dangerous to human life].) Defendant performed that act deliberately, with knowledge of its danger, and in conscious disregard of that danger. (*People v. Hansen*, *supra*, 9 Cal.4th at p. 311 [firearm use known to be dangerous to human life;] *People v. Nieto Benitez*, *supra*, 4 Cal.4th 91; *People v. Tophia*, *supra*, 167 Cal.App.2d at p. 45; cf. *People v. Laws* (1993) 12 Cal.App.4th 786, 793–794 ["if one

---

[10]Shaahid and Little Nate both testified no words were exchanged between Jones and defendant on this occasion. Horns did not testify to any verbal exchange occurring between the victim and the defendant just prior to the shooting in the HomeTown Buffet parking lot.

simply wishes to scare another by shooting a gun in the direction of the other person intending the bullet to just miss that person (i.e., without the intent to kill or injure), the shooter can be guilty of murder if, accidentally, the bullet strikes and kills the person"].)

Defendant notes the jury acquitted him of first degree murder, three counts of attempted murder, and shooting at an occupied vehicle. He argues these acquittals should lead to the conclusion there is insufficient evidence to support a conviction for second degree murder. We are not persuaded. His point fails to account for the numerous federal and California decisions holding that a jury verdict acquitting a defendant of a charged offense does not constitute a finding the defendant is factually innocent of the offense or establish that any or all of the specific elements of the offense are not true. (E.g., *United States v. Watts* (1997) 519 U.S. 148, 155 ["'acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt'" and unless specific findings are made "the jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict"]; *Dowling v. United States* (1990) 493 U.S. 342, 349; *People v. Towne* (2008) 44 Cal.4th 63, 86 ["an acquittal merely establishes the existence of a reasonable doubt as to guilt. Unless specific findings are made, 'the jury cannot be said to have "necessarily rejected" any facts when it returns a general verdict'"]; *In re Coughlin* (1976) 16 Cal.3d 52, 59 ["[T]he fact of an acquittal establishes only that the trier of fact entertained a reasonable doubt of defendant's guilt"]; *In re Dunham* (1976) 16 Cal.3d 63, 66–67.)

In this case, a review of the record reveals the jury entertained reasonable doubt with regard to the willfulness, premeditation, and deliberation elements of first degree murder. It also entertained reasonable doubt concerning any attempt on defendant's part to take the lives of Hammond, Shaahid, and Little Nate. Nevertheless, the jury's acquittal of defendant's guilt as to the first degree murder of Jones, and those pertaining to the attempted murders of the Yukon's remaining occupants, do not constitute a finding that defendant could not be found guilty of second degree murder for Jones's death.

In sum, this is simply not a case where it is clear "that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks*, *supra*, 128 Cal.App.3d at p. 429.)  In contrast, in this case, there was reasonable, credible evidence, of solid value, upon which a reasonable trier of fact could find defendant guilty of second degree murder beyond a reasonable doubt.  (*People v. Watkins*, *supra*, 55 Cal.4th at pp. 1019-1020.)

## DISPOSITION

The judgment is affirmed.

_____

PEÑA, J.

WE CONCUR:


_____

POOCHIGIAN, Acting P.J.


_____

FRANSON, J.

20.