[Crim. No. 2611. First Dist., Div. One. Mar. 28, 1950.]

THE PEOPLE, Respondent, v. LIONEL HENRY PETERS, Appellant.

W. Blair Rixon for Appellant.

Fred N. Howser, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

BRAY, J.—Under an information charging manslaughter, a jury found defendant guilty of that crime. From the judgment entered thereon and from an order denying a new trial, defendant appealed.

### QUESTIONS INVOLVED

1. Was the corpus delicti, that is, was the cause of death, proved? 2. Was certain evidence erroneously admitted? 3. Was there error in the court's instructions?

### FACTS

There is very little conflict in the evidence. About 2:30 a. m. on November 7, 1948, one Clemons[1] and his wife were asleep

---

[1]Referred to in the testimony as "Fats."

in bed in their home in Pittsburg. They were awakened by a knocking at the door. Receiving no answer to his query as to who it was, Clemons went to the door and saw defendant and Cole (the deceased) standing there. Defendant asked where Millie (defendant's girl friend) was and also asked for his "combination" (a radio and phonograph combination). Clemons told defendant that neither was there and for defendant to go home and go to bed. Clemons testified that defendant was drunk. Defendant denied that he was. Clemons closed the door. This angered defendant, who, with his fist, hit the glass panel, breaking it, cutting his hand so that it bled copiously. Defendant claims that Clemons then said that he would get the "little bastard" and break his neck. Defendant ran around behind the house. According to defendant, Clemons came out on the porch and turned the light on, but could not see defendant because the latter was "crouched down." Clemons went in the house and put on his trousers and started out to look for defendant, picking up a "little piece of concrete about—wasn't big as my hand." Defendant came around to the front of the house and started for home. Defendant was carrying a carbine bayonet which had a blade about 6 inches long.[1] Apparently he dropped it and Cole picked it up. Clemons came out of the house and called to defendant. Cole and defendant walked back towards the approaching Clemons. Defendant weighed only about 135 pounds, while Clemons weighed 243 pounds. Defendant is not sure whether he asked Cole for the knife or Cole handed it to him without asking. Defendant claimed that as Clemons came down the street he had one hand behind him and defendant thought he had a pistol. Cole, defendant and Clemons were standing fairly close together. Defendant insisted that Millie and the combination were in Clemons' house. The latter denied that they were. Clemons testified that the defendant's hand was bleeding considerably and he told defendant to go home and take care of his wound, that he told defendant he would have to pay for the broken glass, and defendant said he would. According to defendant, Clemons acted as though he wanted to fight. Cole stepped between him and Clemons to help defendant. Defendant testified that he thought Clemons was about to attack him and was frightened, and that when Cole

---

[1] Referred to throughout the testimony as a "knife."

stepped between them it blocked defendant's view of Clemons and put defendant in a position where he could not defend himself if Clemons were to attack him, so "I took my hand with a side motion—I pushed Cole back in order to protect myself and Cole. When I did that, I stuck him . . ." Defendant had the knife in his hand at this time and during all the argument with Clemons, although Clemons did not know that defendant was armed. Cole grabbed his stomach and walked away. Defendant and Clemons continued arguing for a short time and Clemons returned to his home. Defendant started toward his hotel, dropping the knife en route. A man named Jenkins came in and told defendant that the latter had cut Cole, who had been taken to a hospital. A man dressed defendant's hand. When told that the police were coming, defendant hid under the bed, where the police found him. Defendant admitted that Clemons had made no attack on him either that night or at any other time. Defendant also stated that when Cole stepped between him and Clemons Cole was not interfering "but he steps up in the way, and so if Fats does anything I can't protect myself, and Junior [Cole] couldn't protect himself." Defendant then said, "Look out," and with knife in hand pushed Cole "with my right hand on a horizontal motion. This was the time I cut Junior [Cole]." Apparently defendant did not know he had cut Cole until he was back in his hotel and was told that he had by Jenkins.

The testimony of Clemons as to the cutting is substantially similar to that of defendant except that Clemons claimed that Cole was trying to get defendant to go home and defendant would not go, and that Clemons had left the two of them without knowing that Cole had been cut.

Clearly, the evidence justified the finding of the jury that defendant was guilty of involuntary manslaughter, provided, of course, that decedent died from the knife wound. Defendant does not question the sufficiency of the evidence except on the sole question of the cause of death.

### 1. WAS THE CORPUS DELICTI PROVED?

■ After the cutting Cole walked away from defendant and Clemons, and they did not see him any more. The witness Jenkins testified he heard Cole calling him. Jenkins went up to him and Cole said that he had been cut by defendant and that he might die, and to get a doctor.. Cole was bleeding "pretty bad." About that time a police car came, and Jenkins helped put Cole into the car. There was no testimony as to

the type of wound, its size or depth. Nor was there any testimony as to the cause of Cole's death. A witness testified that Cole was dead, as he had seen his body at the coroner's inquest, the date of which does not appear. There is no evidence as to the date when Cole died. The earliest date appearing in the record after November 7, the day of the cutting, is the date of the information, December 2. Cole died some time between those two dates, a space of almost one month.

Taking the evidence most strongly in favor of the prosecution on this question, it appears that Cole was "stuck" or "cut" by a bayonet, the extent of the cut being unknown. Cole thought he might die from the cutting. A witness said that Cole was bleeding badly, although the witness did not see the wound. Cole was placed in a police car apparently to be taken to a hospital. Some time between then and a date almost a month later Cole died.

It is elementary that in a homicide case the fact that the deceased met his death through the act or agency of the defendant must be proved. It may, of course, be proved by circumstantial evidence. (*People* v. *Spencer*, 58 Cal.App. 197 [208 P. 380].) Obviously, here, the cause of death was not proved by evidence. However, the cause of death is a fact, which, like every other fact, need not be proved, even in a criminal case, if admitted or conceded by defendant. While there was no direct proof of the cause of death, the conduct and attitude of defendant at the trial, as disclosed by the record, constituted at least an indirect concession of the fact.

The situation in this case is unique and probably will never occur in another case. It is not a matter of failure of proof (in spite of the fact that the district attorney offered no evidence of the cause or time of death), but of assumption by all concerned in the trial,—judge, jury, prosecution and defense, —that deceased died from the knife wound inflicted by defendant, and that so far as the cause of death was concerned, it really was not an issue in the case. The only issue was whether defendant could be excused from the stabbing of his friend, under the claim of self-defense, or under the claim of accident. The claim of self-defense to a charge of manslaughter necessarily is an admission that the victim died because of an act of the defendant. If he had not so died, the act could not be manslaughter and hence there would be no necessity to show that the act was justified. However, in the usual case the mere use by the defendant of such a claim does not relieve

the prosecution of its burden of proving that the death was so caused, as the defendant may sit back and require the prosecution to prove its case and then, and only then, be required to set up his defense, which may be (1) that defendant's act did not cause death, or (2) that if it did, defendant was justifiably acting in self-defense, or (3) that the defendant's act was accidental. Defendant may avail himself of any or all of these defenses. But here, defendant did not avail himself of the fact that when the prosecution closed its case, it had not proved the cause of death, nor did the defendant avail himself of the defense numbered (1) above. By his conduct he conceded that the death resulted from the knife wound and relied solely and wholly on his claims of self-defense and accident.

In a criminal case a defendant is not called upon to make explanation, to deny issues expressly (his plea of not guilty does that for him), nor is he required to point out to the prosecution its failure to make a case against him or to prove any link in the required chain of guilt. On the other hand, he cannot mislead the court and jury by seeming to take a position as to the issues in the case and then on appeal attempt to repudiate that position. A reading of the proceedings at the trial, including defendant's statement at the opening of his case and his argument to the jury at the end of the case, clearly shows that at no time was he questioning either that the knife wound caused Cole's death, or that that fact had not been established or was an issue to be resolved by the jury. It also shows that defendant was conceding the cause of death.

As evidence of the assumption by all at the trial of the cause of death, appears the following: Defendant, on cross-examination, was asked to show how he was holding the knife and how with knife in hand he pushed Cole. At the end of several questions and answers on this subject and about four demonstrations, defendant said, "I pushed him like that. (Demonstrating) I meant to push him with my hand." Thereupon the district attorney said, "And you stuck this rather dull knife into him, sufficiently deep to kill him." No objection was made by defendant to this statement.

In *Ryan* v. *United States*, 99 F.2d 864, the court said (p. 870): "In the instant case, as we have already observed, it is admitted by counsel for appellant that the conspiracy alleged in the indictment was established by substantial evidence. That, we take it, established the corpus delicti in this case."

It is well settled that "An admission of a fact made at the trial in open Court by the prisoner or his counsel may be properly considered by the jury." (*People* v. *Garcia,* 25 Cal. 531, 534.) In *People* v. *Hammond,* 26 Cal.App.2d 145 [78 P.2d 1172], defendant's counsel in open court admitted the details of the crime. It was held: "A defendant is bound by the admission of his counsel made in open court." (P. 150.)

In *State* v. *Whiteaker,* 118 Ore. 656 [247 P. 1077], defendant was convicted of violating Oregon's "Blue Sky Law" in that he sold certain securities without having obtained the necessary permit. On appeal, defendant contended that his lack of permit was not proved. After considering certain testimony on the subject, the court said (p. 1080 [247 P.]) : "Furthermore, defendants never contended that any license or permit had been issued to them. In the opening statement to the jury counsel for appellant, in response to the inquiry from the court, 'Do you claim to have had a permit from the Corporation department to sell these (referring to "securities")'? answered, 'No; your Honor, I claim this, that I drew up a receipt which, according to my notions, conformed with the Blue Sky Law, did not conflict with it.' It was not necessary for the prosecution to prove that which was admitted in open court. 16 C.J. 891. Such admissions are conclusive . . ."

While in the above cited cases the admissions of counsel were definite oral statements, the principle laid down applies equally to the unequivocal conduct of counsel from which the jury could properly and reasonably consider that the fact was conceded.

It would be a miscarriage of justice to set aside a verdict found by the jury on all issues which defendant at the trial believed necessary to be submitted to the jury. After all, a criminal case or court proceeding is not a game in which participants may be misled by a defendant's attitude and conduct at the trial, and then the verdict be set aside on appeal, because defendant contends there was no proof of a fact which he had conceded, not by express word, but by conduct.

In the instructions which defendant requested, no hint is given that he was not conceding the cause of death. He offered several instructions on homicide, using the words "homicide" and "killing," some of which the court gave, and he offered no instruction even remotely indicating that the cause of death was an issue. In defendant's instruction 13, given by the court, defendant used the words "that at the time the

knife was wielded which resulted in the death of'' Cole. In his instruction 15 he used the language, ''The mere fact that an unfortunate and *fatal* accident happened . . .'' (Emphasis added.) Defendant closed his argument to the jury in this language: ''. . . it is only justice, both for the State and for this defendant, that he be freed, because Mr. Peters' actions, *although resulting in disaster to his friend as we have all admitted,* were in defense of his life and that of his friend.'' (Emphasis added.)

Even on the argument of the motion for new trial, defendant confined himself to a discussion of the claimed error in an instruction which matter he argued at considerable length.

A defendant in a criminal case, of course, is entitled to the benefit of every reasonable doubt, but the record shows that by the conduct of defendant and all other participants at the trial, no doubt was raised that defendant was conceding the cause of death.

2. Evidence.

■ On the direct examination of the witness Jenkins the following occurred: ''Q. Now when you were carrying Junior [Cole], as you knew him, did he say anything to you? Mr. Rixon [for the defendant]: I'll object, if the Court please, to any conversations outside the presence of the defendant. The Court: How about it counsel? You're not contending that this is a dying declaration, are you? Mr. Walker [for the prosecution]: Yes, I am. I will withdraw that question and phrase it this way, if the witness will wait a moment so that counsel can object if he wishes to, to this question.'' Thereafter the district attorney examined the witness at considerable length concerning the ''apprehension that he might die'' and then concerning the statements then made by Cole to the effect that defendant had cut him. Defendant now contends that the statements made by deceased were not dying declarations and hence not admissible. Whether they were or were not dying declarations is not important for three reasons: (1) Defendant at no time other than the single objection given above objected to their admission. The contention that evidence was erroneously admitted will not be considered on appeal where objection was not made in the trial court. (*People* v. *Willis,* 30 Cal.App.2d 419 [86 P.2d 670].) It will be noted that the district attorney instructed the witness to wait so counsel could object but counsel did not object. (2) Two other witnesses testified without objection to the same statements.

(3) The main statement made by deceased was that defendant had cut him. This the defendant admitted in his own testimony.

3. INSTRUCTIONS.

■ Defendant contends that in giving its instruction the court mixed instructions on involuntary manslaughter with instructions on self-defense so that the jury would consider that even if acting in self-defense defendant would have to use due care and circumspection, and complains particularly of the court's refusal to give the whole of the following instruction (the italicized portion is that which the court refused to give): "Although the jury may believe from the evidence beyond a reasonable doubt that the defendant LIONEL PETERS knifed and killed RONALD COLE, yet if you further believe from the evidence that at the time the knife was wielded which resulted in the death of said RONALD COLE, the defendant, in good faith believed and had reasonable grounds to believe that he was in danger of losing his life or suffering great bodily harm at the hands of VERNON CLEMENS, and there appeared to the defendant exercising a reasonable judgment at the time and under the circumstances no other reasonable means of averting the impending, or to him apparent, danger, then he had a right to use such force as was to him apparently necessary to protect himself from such impending injury or harm, and if so acting, drew the knife and struck with it at the said VERNON CLEMENS and missed him and struck the said RONALD COLE and killed the said RONALD COLE, then you will find him not guilty. *Or if the jury believes from the evidence that defendant drew the knife with no intention of striking the said RONALD COLE, or attempting to strike him with it, and defendant accidentally and unintentionally struck the said RONALD COLE while the defendant was not endeavoring to strike the said RONALD COLE or the said VERNON CLEMENS with it, he should be acquitted.*"

The court properly refused to give the omitted portion. It was not a correct statement of the law. The part given was correct as to the right of the defendant to act in self-defense, but the second portion, which was on the subject of accidental striking, left out the very important element that if the defendant drew his knife and accidentally and unintentionally struck Cole he could be guilty of involuntary manslaughter if he did not use due care and circumspection under the circumstances in his conduct toward his friend Cole. While

this instruction was approved in *Beaty* v. *Commonwealth,* 140 Ky. 230 [130 S.W. 1107], it is ambiguous. After referring to action in self-defense, it shifts somewhat and deals with a situation in which defendant was not attempting to strike *either* Cole or Clemons, and states that if the injury were accidental defendant should not be found guilty, without regard to whether the accident was due to lack of care or circumspection on defendant's part. The omitted portion purported to be an instruction to the effect that if the striking with the knife were accidental the jury should not inquire into the circumstances of the accident to determine if it might have been caused by defendant's lack of care.

Defendant's criticism of the instructions as a whole, to the effect that they told the jury that in acting in self-defense a defendant must act with care and circumspection, is not well founded. The court did not so instruct, and defendant has pointed out no instruction in which it did so. The instructions discussed due care only in connection with the statutory definition of involuntary manslaughter. Moreover, one of these instructions was offered by defendant. The court properly and sufficiently instructed upon the two theories: (1) that defendant acted reasonably in self-defense (care and circumspection not involved) ; (2) although not acting in self-defense (the injury being caused by accident) defendant exercised due caution and circumspection.

The judgment and order are affirmed.

Peters, P. J., and Schottky, J. pro tem., concurred.

A petition for a rehearing was denied April 12, 1950, and appellant's petition for a hearing by the Supreme Court was denied April 24, 1950. Carter, J., voted for a hearing.