Filed 10/31/24  P. v. Flint CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B333482 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA071779) |
| v. | |
| JUSTIN ASHLEY FLINT, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel J. Lowenthal, Judge.  Reversed with directions.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General for Plaintiff and Respondent.

In 2006, appellant Justin Ashley Flint acted as a lookout for his associate Frank Gonzalez as Gonzalez attempted to rob Maria Cecilia Rosa, an off-duty Los Angeles County Sheriff's Deputy. During the attempt, Gonzalez shot Rosa, killing her. In 2007, a jury convicted Flint of first degree murder and attempted robbery.[1]

In 2019, Flint filed a petition for resentencing under the predecessor to Penal Code section 1172.6.[2] The court held an evidentiary hearing to determine whether, for purposes of section 189, subdivision (f), Flint knew or reasonably should have known at the time of the murder that Rosa was a peace officer engaged in the performance of her duties. The court found beyond a reasonable doubt that Flint had such knowledge, and denied his petition for resentencing. Flint appealed.

Flint contends: (1) Rosa was a peace officer described in subdivision (c) of section 830.1 and was not, therefore, acting in the course of her duties when Gonzalez shot her; and (2) The court erred in admitting certain hearsay statements made by Gonzalez while in custody. For the reasons given below, we remand the matter for a further evidentiary hearing to determine

---

[1] Gonzalez was tried separately and received the death penalty, which the Supreme Court has affirmed. (*People v. Gonzalez* (2021) 12 Cal.5th 367.)

[2] Subsequent unspecified statutory references are to the Penal Code.

Flint filed his petition under the predecessor to section 1172.6, which was originally codified as section 1170.95. (See Stats. 2018, ch. 1015, § 4; Stats. 2022, ch. 58, § 10.) For the sake of consistency and to avoid confusion, we will refer only to the current statutory designation.

whether Rosa was, at the time of her murder, acting "in the course of [her] duties" as a peace officer. We further conclude that the court did not abuse its discretion in allowing the challenged statements by Gonzalez into evidence.

## FACTUAL AND PROCEDURAL SUMMARY

### A.    Background

In the early morning of March 28, 2006, Gonzalez and Flint broke into residential garages and yards from which they stole property, including two bicycles. Flint was aware that Gonzalez possessed a gun. At some point, Gonzelez told Flint, " 'I'm going to go snatch someone's purse.' "

Shortly before 6:00 a.m., they were riding the stolen bicycles in a residential area of Long Beach and came upon Rosa, a Los Angeles County Sheriff's Deputy. Rosa had just left her home to drive to the Los Angeles County Inmate Reception Center, where she worked. She was not in uniform. Her unmarked car was in her driveway facing away from the street. As Rosa stood near the open trunk of her car, Gonzalez got off his bicycle and approached her from behind. Flint remained on his bicycle and watched from a distance that he described at different times as "about two car lengths away," "a house away," and about 27 feet away. Flint heard Gonzalez say something to Rosa about her purse. Rosa's response is the subject of conflicting evidence, discussed below. Gonzalez started to run away from Rosa, then pulled the gun from his waistband and shot her twice, causing her death.

Officers responding to the scene examined and photographed the trunk of Rosa's car. A car key was in the keyhole on the trunk door. Inside the trunk, they found the

3

following items:  A gym bag, Rosa's purse, her 9 millimeter semiautomatic pistol, her sheriff's deputy badge holder with her badge inside, her gun holster, and boots.  An officer described the items in the truck as having been "scattered" or strewn about.

Rosa's purse was upright, unzipped, and open.  It contained her handcuffs, keys, and miscellaneous personal items.  According to a detective, the purse "was relatively empty" and had enough room to carry her firearm, badge, and wallet, none of which was in the purse.

Rosa's firearm was found on the right side of the trunk, partially covered by the gym bag, and separated from her holster.  Rosa's holster was between a plastic grocery bag and a boot.  Her wallet was near the back of the trunk, underneath the gym bag, a boot, and an envelope.  Rosa's badge holder was closed— thereby concealing the badge—and lying on top of, and partially inside, a plastic grocery bag on the left side of the trunk near the trunk opening.  According to a detective, it appeared as if the badge holder had fallen or been dropped there.  The detective explained that officers respect their badges and "don't normally just toss them in the trunk of the car."

Rosa ordinarily kept her firearm in her purse or in a holster clipped to her waistband.  Based on the clothes Rosa was wearing that morning, a detective opined that Rosa would not have been wearing her firearm in a holster or on her waistband.

Particles of lint found in the gun barrel of Rosa's firearm indicated that it had not been fired recently.  Indeed, the gun had what a firearms expert described as a "failure to eject" malfunction.  This malfunction occurs when someone attempts to manually eject a cartridge from the gun's chamber, but fails to pull back the slide far enough to eject the cartridge completely.

The partially ejected cartridge prevents another cartridge from loading into the chamber.  An attempt to manually eject a cartridge requires one hand to hold the gun and a second hand, or some other object, to pull the slide back.

After shooting Rosa, Gonzalez went to the home of Glenn Gosnell.  Gosnell described the visit to detectives about three months later.  Gosnell told the detectives that Gonzalez was "freaking out, about how he shot a cop."  Gonzalez told Gosnell that he was going to rob Rosa, and Rosa "started reachin' for somethin'."  Gonzalez said he thought Rosa was reaching for a gun.  He felt threatened, and shot her.  After shooting Rosa, Gonzalez ran "up to her" and "looked in" and saw "the badge" inside the car.  Gonzalez was not more specific as to where in the car he saw the badge.  A detective asked Gosnell if Gonzalez said he saw a gun, and Gosnell responded:  "He didn't say.  He just kept sayin' a badge."  When the detective asked if Gonzalez had said why he selected Rosa to rob, Gosnell said:  "She was there."  Gonzalez also told Gosnell that Flint was "down the street" when the shooting occurred and "he didn't know nothing."

About two days after the murder, Gonzalez spoke to Jessica Rowan about the murder.  Rowan testified about the conversation during a preliminary hearing in March 2007.  According to Rowan, Gonzalez told her, " 'We did something, we did something in Long Beach,' " and showed her a newspaper article about the murder, which described Rosa as a deputy sheriff.  When Rowan questioned Gonzalez about the matter, Gonzalez told her that "he tried to rob [Rosa] because he wanted dope," and he "tried to rob her, take her purse" and "her money," but Rosa "didn't want to give it to him."  Gonzalez told Rowan that "[b]oth of them" tried to rob Rosa, but Gonzalez "was the one that said[,] 'give me your

money.'" Rosa then started "fighting with him." Gonzalez told Rowan he had seen a badge "in the back seat" of Rosa's car as he left the scene.

In the days following the shooting, Flint told at least four people about the crime. On one occasion, within a day or two after the murder, Flint went to the home of Eddie Zogg. Eric O'Brien and Mark Smith were also there. According to Flint, he told them that he and Gonzalez were trying to "take lawn mowers or something and [Gonzalez] ended up shooting somebody." The others told him they had heard about the murder and said the victim was a deputy. When a detective asked Flint if he already knew that fact, he responded, "[n]ot [until] they showed me that flyer." The "flyer" is a bulletin about the crime that law enforcement published on April 7, 2006, 10 days after the murder.

According to Zogg, Flint came to his house a day or two after the shooting. Eric O'Brien was there at the time. Flint told Zogg and O'Brien that he and a friend "tried to rob some lady" and that "she fought back" or "put up a struggle." Flint said he "heard a gunshot" and "took off running." A detective asked Zogg if Flint had said anything about the victim "being a cop or anything like that," and Eddie responded that Flint "didn't say anything like that."

At some point, Zogg saw the flyer about the murder posted on a bulletin board at his place of work. He took the flyer and showed it to O'Brien.

According to O'Brien, Flint came to Zogg's house and said that Gonzalez "tried to rob somebody," that Flint "heard shots," and then "they took off." At some point, maybe "a couple weeks after" the murder, Flint saw the flyer about the murder and

acknowledged to O'Brien that he was involved in the crime. Flint told O'Brien that the victim "was a cop," and she had "a gun." Flint also told O'Brien that he "saw the victim's badge." Flint did not tell O'Brien where Rosa had the gun or badge.

In August 2006, Flint and Gonzalez were in custody on unrelated robbery charges. They were initially placed in different holding cells, each with undercover officers posing as fellow inmates—a so-called *Perkins*[3] operation. Later, Flint and Gonzalez were placed together in a cell. Their conversations with the undercover officers and each other were audio and video recorded. When an undercover officer asked Flint why Gonzalez shot Rosa, he replied: "[The] bitch pulled out a gun" and it was "a bigger caliber gun than the one we had." Although Flint made many statements during the *Perkins* operation incriminating himself and Gonzalez in the attempted robbery of Rosa and incriminating Gonzalez in Rosa's murder,[4] Flint did not say to the ostensible inmates that he ever saw Rosa's badge.

Gonzalez told the undercover officers that Rosa had "tried to sneak up on [him]." An officer asked, "What did she pull out a gun?" Gonzalez responded, "Badge." When asked, "What was she trying to do? You were tryin' a jack her or something?" Gonzalez responded, "No. She just came up straight for it," called him by his gang moniker, Grumpy, and told him, "Come here." As he said this, Gonzalez held his right hand in the air, appearing to mimic an officer holding up a badge. At another

---

[3] *Illinois v. Perkins* (1990) 496 U.S. 292.

[4] Evidence of statements Flint made during the *Perkins* operation are summarized in *People v. Flint* (July 6, 2010, B205374) [nonpub. opn.] (*Flint I*).

7

point, Gonzalez said: "[S]he was just flashing her badge at me. That's all I remember. I just let loose."[5]

In September 2006, detectives interviewed Flint. According to Flint, Gonzalez told him he wanted to snatch someone's purse, and Flint understood that he was to look out for the police. Flint said he was about "a house away" when he saw Gonzalez tell "some lady[,] like give me your purse or something." The woman said, "[H]old up, hold up," and "pulled out a gun." Gonzalez started running, then "shoots her." Rosa remained standing, leaning against her car. Flint and Gonzalez then "ran off."

Flint testified at his 2007 trial. As he stated in his police interview, he saw Gonzalez approach Rosa, say something to her, and heard Rosa say, "Hold on, hold on," or "hold up, hold up." He saw Rosa "coming up with . . . a gun," holding it with a two-handed grip. Gonzalez started running, took five or six steps, then reached back and shot Rosa. Flint thought he heard two or three shots. After Rosa was shot, Flint saw her still standing by the trunk of the car. He denied that he had seen Rosa's badge.

## B. Procedural History

Flint's jury was instructed on aiding and abetting, the natural and probable consequences doctrine, and the felony murder rule. The jury convicted Flint of first degree murder (§ 187) and attempted robbery (§§ 211, 664). The jury also found true an allegation that a principal in the crime was armed with a firearm (§ 12022, subd. (a)(1)), and found not true a felony

---

[5] The evidence of Gonzalez's statements was admitted at Flint's section 1172.6 evidentiary hearing over defense objection.

8

murder special circumstance allegation (§ 190.2, subd. (a)(17)). The court sentenced Flint to 29 years to life in prison.

In Flint's direct appeal, we modified the judgment by reducing his sentence to 26 years to life, and affirmed the judgment as modified. (*Flint I*, *supra*, B205374.)

In January 2019, Flint filed a facially sufficient petition for resentencing under section 1172.6. Among other allegations, Flint alleged: "The victim of the murder was not a peace officer in the performance of his or her duties, or I was not aware that the victim was a peace officer in the performance of his or her duties and the circumstances were such that I should not reasonably have been aware that the victim was a peace officer in the performance of his or her duties."

In November 2020, the court found that Flint had failed to establish a prima facie case for relief under section 1172.6 and denied the petition without issuing an order to show cause or holding an evidentiary hearing. Flint appealed.

We reversed. (*People v. Flint* (2022) 75 Cal.App.5th 607, 618 (*Flint II*).) The trial court reached its conclusion, we explained, by weighing the evidence and exercising discretion, which the court could not engage in at the prima facie stage. (*Id.* at p. 612.) We directed the court to issue an order to show cause and hold further proceedings in conformance with our opinion. (*Id.* at p. 618.)

Following remand, the court issued an order to show cause and held an evidentiary hearing. Flint asserted, and the prosecution and the court agreed, that the issue to be decided was whether, for purposes of section 189, subdivision (f), Flint knew or reasonably should have known that Rosa was a peace officer

9

engaged in the performance of her duties at the time Gonzalez shot her.

The prosecution introduced the reporter's transcript from the 2007 trial, certain exhibits from the trial, and the clerk's transcript on appeal from Flint's direct appeal. The court heard testimony from a detective involved in the undercover *Perkins* operation, an investigating detective, a sheriff's deputy who was living with Rosa at the time she was killed, and Sergeant Daniel Inez, a Los Angeles County Sheriff's Department (sheriff's department) firearms trainer.

With the exception of part of Inez's testimony, our factual statement above summarizes the evidence admitted at the evidentiary hearing. Inez further testified to the following.

Inez supervises firearms trainings for the sheriff's department. Rosa attended the sheriff's department academy in 2000 and became a deputy that year.

Inez stated that sheriff's deputies are permitted to carry a firearm while off duty. When they do, they must also carry their identification and badge. Deputies are trained that when they draw their firearm or take other police action, they should verbally identify themselves as deputies and hold up their badge "in a manner so that anyone around has the ability to see it." There is no policy or regulation, however, that requires deputies to display their badge before drawing a firearm.

The prosecutor showed Inez a photograph of Gonzalez, excerpted from a video recording during the *Perkins* operation where Gonzalez appears to be mimicking Rosa's response to his attempted robbery. Inez stated that the manner in which Gonzalez held up his hand is consistent with the way deputies are trained to present their badge.

10

Inez opined that if Rosa carried a firearm and badge in her purse, she would be following the sheriff's department policy. And if Rosa identified herself and attempted to use her firearm to prevent herself from being the victim of an attempted robbery, she would be acting in the course of her duties and in accordance with her training.

## C.  The Court's Ruling

In ruling from the bench, the court stated that Rosa presented her badge and she was acting in the performance of her duty because a peace officer, "even when off-duty, is on duty," and has "the authority to make an arrest 24 hours a day." The court concluded that it found "beyond a reasonable doubt that Flint knew that Deputy Rosa was a peace officer engaged in the performance of her duties at the time that Gonzalez shot her." He therefore denied the petition.

In a written ruling, the court stated that "Rosa, although off-duty, was engaged in the performance of her duties at the time that she was killed. An off-duty Los Angeles County Sheriff's Deputy possesses a continuing status as a peace officer. ( . . . § 830.1.) In section 830.1, the Legislature has clearly empowered peace officers to make arrests while off-duty. Deputy Rosa, in attempting to apprehend a robbery suspect, was indisputably acting in the scope of her employment at the time that she was killed."

The court pointed to Sergeant Inez's testimony that Rosa was trained that when confronted with criminal activity while off-duty, to respond by presenting her badge above her head and identifying herself as a police officer. The court explained that the evidence showed that Rosa acted in conformity with this training as shown by the fact that her badge was found in

11

the open trunk of her car.  The court stated that the "most plausible scenario, for the badge to have been transported from the purse to its resting place, is that Deputy Rosa removed it from her purse, presented it to the assailants, and then dropped it after being shot.  [¶]  Deputy Rosa's weapon was found, in the trunk, roughly three feet to the right of the badge.  This positioning suggests that she presented the badge in her left hand while holding the gun in her right and, upon collapsing against the trunk, dropped both items into the trunk a shoulder's width apart.  The physical evidence indicates, beyond a reasonable doubt, that Deputy Rosa presented her badge and identified herself as a peace officer."

The court also relied on Gonzalez's statement to an undercover officer during the *Perkins* operation that he saw Rosa's badge, and O'Brien's testimony that Flint told him he saw the badge and was aware she was a peace officer.

The court concluded that, "[b]ased on the totality of the evidence, [the prosecution] has proven, beyond a reasonable doubt, that Flint was aware, before the shooting, that Deputy Rosa was a peace officer who was engaged in the performance of her duties."

Flint appealed.

## DISCUSSION

### A.    Rosa's Peace Officer Status and Authority

#### 1.    *Legal Background*

Section 189 defines first degree murder to include murder that is committed in the perpetration of, or attempt to perpetrate, certain crimes, including robbery.  (§ 189, subd. (a).)  Prior to the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate

12

Bill No. 1437), liability under this felony murder rule attached to "any killing in the perpetration of or attempt to perpetrate [a] robbery" "regardless of whether it was intentional or accidental." (*People v. Coefield* (1951) 37 Cal.2d 865, 868; see generally 1 Witkin et al., Cal. Criminal Law (5th ed. 2024) Crimes Against the Person, § 57.)  In Senate Bill No. 1437, the Legislature added subdivision (e) to section 189, which requires, generally, that a defendant will be liable under the felony murder rule only if (1) the defendant "was the actual killer," (2) the defendant "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer," or (3) that the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life."  (§ 189, subd. (e)(1)–(3); see *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 228.)

The Legislature also created a single exception to the section 189, subdivision (e) felony murder requirements. (*Flint II*, *supra*, 75 Cal.App.5th at p. 610.)  Under subdivision (f) of section 189, when "the victim is a peace officer who was killed while in the course of [the peace officer's] duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of [the peace officer's] duties," "the felony-murder doctrine applies as it did before the enactment of Senate Bill No. 1437." (*Flint II*, *supra*, 75 Cal.App.5th at p. 610.)  Thus, "[i]f the defendant is a participant in one of the designated crimes and while committing the felony a peace officer is killed, the defendant may be convicted of first degree felony murder" without any additional showing of malice or premeditation and "without proof the defendant was the actual killer, that the defendant, with the

13

intent to kill, assisted in the commission of the killing, or that the defendant was a major participant in the underlying felony and acted with reckless indifference to human life."  (Couzens et al., Sentencing California Crimes (The Rutter Group 2024) § 23:48, citing *People v. Hernandez* (2021) 60 Cal.App.5th 94, 105–109.)

Senate Bill No. 1437 "also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended."  (*People v. Strong* (2022) 13 Cal.5th 698, 708.)  This mechanism, now codified in section 1172.6, allows "defendants previously convicted of felony murder who 'could not be convicted of first or second degree murder because of changes' in the law to petition to vacate their convictions and be resentenced."  (*Flint II*, *supra*, 75 Cal.App.5th at p. 610.)  When, as here, the defendant has established a prima facie claim for relief, the defendant is entitled to an evidentiary hearing.  (§ 1172.6, subds. (c) & (d)(1); *Strong*, *supra*, at p. 708.)  At that hearing, the prosecution has "the burden . . . to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [the law of murder]."  (§ 1172.6, subd. (d)(3).)

When the trial court holds an evidentiary hearing on a section 1172.6 petition, it acts as an independent factfinder to determine whether the defendant is guilty of murder beyond a reasonable doubt under current law.  (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123; *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)  "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

## 2. *Further Proceedings Are Required To Determine Whether Rosa Was Acting in the Course of Her Duties*

Section 189, subdivision (f) has three elements:  (1) the "victim is a peace officer"; (2) the victim "was killed while in the course of the peace officer's duties"; and (3) "the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties." (§ 189, subd. (f).)  There is no dispute that Rosa was a deputy sheriff, and thus a "peace officer," as statutorily defined.  (See § 830.1, subd. (a) [a deputy sheriff is a peace officer].)  Flint contends, however, that the prosecution failed to prove the second element:  at the time Rosa was shot, she was acting in the course of her duties as a peace officer when Gonzalez killed her.

Flint does not dispute that, under subdivision (a) of section 830.1, the authority of a peace officer ordinarily extends to any place in the state "[a]s to a public offense committed . . . in the peace officer's presence, and with respect to which there is immediate danger to person or property" or that Gonzalez's attempted robbery constituted such a "public offense."  (See § 830.1, subd. (a)(3).)  He argues, however, that Rosa was a deputy described in subdivision (c) of section 830.1, which created "a new lower-tier category of custodial peace officer," with "limited custodial duties, more limited training than other sheriff's deputies, and limited peace officer powers."   (*People v. Orosco* (2022) 82 Cal.App.5th 348, 356 (*Orosco*).)

Peace officers described in subdivision (c) of section 830.1 are "employed to perform duties exclusively or initially relating to custodial assignments with responsibilities for maintaining the operations of county custodial facilities, including the custody, care, supervision, security, movement, and transportation of

15

inmates." (§ 830.1, subd. (c).) Such deputies are not required to complete "the full course of training required for regular sheriff's deputies by the Commission on Peace Officer Standards and Training (POST)." (*Orosco*, *supra*, 82 Cal.App.5th at p. 357.)

The scope of authority of deputies described in section 830.1, subdivision (c) is narrower than the authority of deputies described in subdivision (a); it "extends to any place in the state *only while engaged in the performance of the duties of the officer's respective employment and for the purpose of carrying out the primary function of employment relating to the officer's custodial assignments*, or when performing other law enforcement duties directed by the officer's employing agency during a local state of emergency." (§ 830.1, subd. (c), italics added.) When not so engaged, the deputy is "without peace officer status during that time." (85 Ops.Cal.Atty.Gen. 130, 131 (2002).)

Flint points to evidence that Rosa worked at the Los Angeles County Inmate Reception Center and had never "worked the street." Therefore, Flint argues, Rosa was a deputy described in subdivision (c) of section 830.1, and, as such, had no peace officer authority while off-duty; and because she was off-duty at the time Gonzalez killed her, she was not "killed while in the course of [her] duties," for purposes of section 189, subdivision (f).

As the Attorney General argues, Flint did not raise this argument below. Indeed, through counsel, he informed the court prior to the hearing that "[t]he sole issue in [the evidentiary hearing] is what Flint knew or reasonably should have known at the time of the shooting." In its response to the petition for resentencing, the prosecution adopted Flint's position,

16

stating that the evidentiary hearing is "for the sole purpose of determining whether . . . Flint knew or reasonably should have known that . . . Rosa was a peace officer engaged in the performance of her duties at the time she was murdered." At the outset of the hearing, the court accepted the representations of counsel for both sides, and stated that "the issue in this case is whether Mr. Flint knew, or reasonably should have known, that Deputy Rosa was a peace officer engaged in the performance of her duties when Gonzalez killed her." And during the hearing, after it appeared that the question of what Flint knew or should have known would turn on the narrower question whether he had seen Rosa's badge before or during the crime, the court stated: "We all agree, the only issue in this proceeding is whether or not Flint saw the badge." Flint's counsel never gave any indication that he had changed his position as to the issues or that he disagreed with either the prosecutor's or the court's framing of the issue.

The prosecutor, in her closing argument, reiterated that the "only question at this hearing is: Did Justin Flint know or reasonably should have known . . . Rosa was a peace officer engaged in the performance of her duties when she was killed." In his closing, Flint's counsel did not disagree with the prosecutor's statement of the issue and raised no question regarding Rosa's authority as a peace officer or whether she was acting in the course of her duties at the time she was killed.

The Attorney General argues that the forfeiture rule applies here because, if Flint had raised the question whether Rosa's authority was limited under section 830.1, subdivision (c), the prosecutor "could have admitted additional evidence that could have quickly cleared up the concern, such as Deputy Rosa's

17

POST certificate or additional testimony from Sergeant Inez regarding her designation and/or certification." The Attorney General further argues that if Flint did not forfeit the issue and we do not reject his argument on the merits, we should remand the matter so that the trial court can address "whether Deputy Rosa was acting within the scope of her duties for purposes of the section 189, subdivision (f), peace officer exception."

Flint, anticipating the Attorney General's forfeiture argument, points out that a challenge to the sufficiency of the evidence can be raised for the first time on appeal. (See *People v. Kiger* (2022) 76 Cal.App.5th 1147, 1150; *People v. Butler* (2003) 31 Cal.4th 1119, 1126 (*Butler*).) Flint further argues that, if his appointed counsel forfeited the issue by failing to argue it below, the failure deprived him of his right to effective assistance of counsel.

Prior to the date set for oral argument, we informed the parties that "they may wish to address the applicability of *People v. Peters* (1950) 96 Cal.App.2d 671, 675–678" (*Peters*) to this issue. In response, Flint filed a motion for leave to file a supplemental brief to address *Peters*. We granted the motion and allowed the Attorney General to file a response. We have read and considered the supplemental briefs submitted by both parties.

In *Peters*, the defendant, during a confrontation with one person unintentionally stabbed a different person, named Cole. (*Peters*, *supra*, 96 Cal.App.2d at p. 674.) Cole was treated at a hospital for his injury but later died. The defendant was charged with involuntary manslaughter. At his trial, no evidence of the cause of Cole's death was admitted. (*Id*. at p. 675.) On appeal, the defendant argued that the absence of evidence of the cause

18

of death constituted a failure to prove that fact. The Court of Appeal rejected the argument. The court explained: "In a criminal case a defendant is not called upon to make [an] explanation, to deny issues expressly (his plea of not guilty does that for him), nor is he required to point out to the prosecution its failure to make a case against him or to prove any link in the required chain of guilt. On the other hand, he cannot mislead the court and jury by seeming to take a position as to the issues in the case and then on appeal attempt to repudiate that position. A reading of the proceedings at the trial, including defendant's statement at the opening of his case and his argument to the jury at the end of the case, clearly shows that at no time was he questioning either that the knife wound caused Cole's death, or that that fact had not been established or was an issue to be resolved by the jury. It also shows that defendant was conceding the cause of death." (*Id.* at p. 676.)

The *Peters* court further stated: "It would be a miscarriage of justice to set aside a verdict found by the jury on all issues which defendant at the trial believed necessary to be submitted to the jury. After all, a criminal case or court proceeding is not a game in which participants may be misled by a defendant's attitude and conduct at the trial, and then the verdict be set aside on appeal, because defendant contends there was no proof of a fact which he had conceded, not by express word, but by conduct." (*Peters*, *supra*, 96 Cal.App.2d at p. 677; see *People v. Pijal* (1973) 33 Cal.App.3d 682, 697 [it is "well established that the defendant . . . cannot mislead the court and jury by seeming to take a position on issues and then disputing or repudiating the same on appeal"]; accord, *In re Francis W.* (1974) 42 Cal.App.3d 892, 903.)

19

In his supplemental brief regarding *Peters*, Flint relies on *Butler*, *supra*, 31 Cal.4th 1119. In that case, a jury convicted the defendant of committing lewd and lascivious acts with a minor under the age of 14 (§ 288, subd. (a)), sexual battery (§ 243.4, subd. (d)), and attempted sexual penetration (§§ 289, subd. (i), 664). In sentencing the defendant, the court ordered that he submit to a blood test for AIDS. (See § 1202.1, subd. (a).) The court did not, however, make a required finding " 'that there is probable cause to believe that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim.' " (*Butler*, *supra*, 31 Cal.4th at p. 1125.) Although the defendant did not object to the testing order in the trial court, he argued on appeal that the evidence was insufficient to support an implied finding of probable cause. The Supreme Court held that the defendant had not forfeited the argument based on the general rule that challenges to the sufficiency of the evidence can be asserted on appeal notwithstanding the failure to raise the issue below. (*Id.* at pp. 1126–1128.)

In considering the remedy, the *Butler* court observed that, " 'in the absence of an objection at trial, the prosecutor had no notice that such evidence would be needed to overcome a defense objection.' " (*Butler*, *supra*, 31 Cal.4th at p. 1129.) If "evidence exists to support a testing order," the court stated, striking the testing order for lack of substantial evidence "would be unfair to both the victim and the public." (*Ibid.*) The court therefore agreed with the Court of Appeal that the appropriate remedy was to remand the matter "for further proceedings to determine whether the prosecution has additional evidence that may establish the requisite probable cause." (*Ibid.*)

20

A similar analysis and remedy are appropriate here. As in *Butler*, we apply the general rule that a challenge to the sufficiency of the evidence is not forfeited by failing to raise the issue below. In light of that failure and defense counsel's representations as to the issues to be decided in the evidentiary hearing, however, the prosecutor reasonably saw no need to introduce evidence as to whether Rosa's authority was limited by section 830.1, subdivision (c), and the court had no reason to consider or make a finding on that point. Reversing the court's order based on insufficiency of the evidence would thus be unfair to the People and the court if, as the Attorney General asserts, there is evidence that would support the necessary finding. (See *Butler*, *supra*, 31 Cal.4th at p. 1129.) Therefore, the appropriate remedy is to direct the court to hold a further evidentiary hearing to determine whether Rosa was, at the time of her murder, acting "in the course of [her] duties" as a peace officer. (§ 189, subd. (f); see § 830.1, subds. (a) & (c); see also *People v. Jones* (2022) 86 Cal.App.5th 1076, 1093 [where trial court apparently failed to consider relevant issue in denying resentencing petition, Court of Appeal remanded the case "in the interest of justice" to give the court "a meaningful opportunity to consider" the issue].)

## B.  Admission of Gonzalez's *Perkins* Operation Statements

Prior to the evidentiary hearing, Flint objected to the introduction of Gonzalez's statements made during the *Perkins* operation that Rosa had displayed her badge prior to him firing the shots that killed her. The court allowed the statements into evidence, stating that the concerns about their trustworthiness go "to the weight, not the admissibility of [the evidence]." Flint

21

contends that the ruling was erroneous and prejudicial.  We disagree.

Gonzalez's hearsay statements were admitted as a statement against penal interest under Evidence Code section 1230.[6]  We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion.  (*People v. Grimes* (2016) 1 Cal.5th 698, 711.)  We will not disturb the court's ruling " ' "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 585 (*Geier*).)

Flint does not dispute that Gonzalez was unavailable for purposes of Evidence Code section 1230 or that his statements were against his interest in that they "subjected him to the risk of . . . criminal liability." (Evid. Code, § 1230.)[7]  He challenges only the court's determination that they are sufficiently trustworthy to be admissible.

" 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and

---

[6] Evidence Code section 1230 provides:  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

[7] As Flint acknowledges, his trial counsel did not challenge Gonzalez's unavailability or that the statements were against Gonzalez's penal interest.  His challenge below, and on appeal, is limited to the argument that the statements are not trustworthy.

hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Geier*, *supra*, 41 Cal.4th at p. 584.)

The finding that the statements are sufficiently trustworthy to be admissible is supported by the degree to which the statements were against Gonzalez's penal interest. As the Attorney General asserts, at the time Gonzalez made the statements he was in custody on charges unrelated to the murder of Rosa, and there is no evidence that he believed he was being investigated for that crime. The admission that he saw Rosa's badge, even though he wasn't asked that question but rather asked if Rosa pulled a gun on him, is particularly weighty because shooting Rosa in response to her pulling a gun on him might support a self-defense argument; shooting her after seeing her badge, however, is evidence that not only weakens or defeats a self-defense claim, but supports a special circumstance warranting a death sentence. (§ 190.2, subd. (a)(7).) The court could reasonably conclude that a reasonable person in Gonzalez's position would not have made such an admission "unless he believed it to be true." (Evid. Code, § 1230.)

Flint contends that Gonzalez's statements regarding a badge are not trustworthy because they conflict with statements he made to Gosnell and Rowan shortly after the murder. He informed both of them that he saw the badge after he shot Rosa. He further asserts that the circumstances of Gonzalez's statements—being in a jail cell with other ostensible inmates and his inclusion of false statements in his description of the incident—suggest that he made his statements about a badge

23

as a way of bragging about the crime.  Although these are valid considerations in evaluating the trustworthiness of the statements, they are not so weighty as to render the court's ruling an abuse of discretion.  Accordingly, the court did not err in allowing the statements into evidence.

## DISPOSITION

The order denying Flint's petition for resentencing is reversed.  The court shall conduct further proceedings in accordance with the views expressed in this opinion.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:



BENDIX, J.



WEINGART, J.

24